AMBASSADOR BUILDING CORPORATION, A CORPORATION, APPELLANT, v. ST. LOUIS AMBASSADOR THEATRE, INC., A CORPORATION, RESPONDENT.—185 S. W. (2d) 827.

St. Louis Court of Appeals. Opinion filed February 27, 1945.

602

● *Jones, Hocker, Gladney & Grand, Orville Richardson, Clarence M. Turley* and *Vincent L. Boisaubin* for appellant.

*Burnett, Stern & Liberman* and *Lt. James H. Arthur, U. S. M. C. R.* for respondent.

McCULLEN, J.—This suit for a declaratory judgment was brought by appellant, as plaintiff, against respondent, as defendant, to have the court. declare the rights and obligations of the parties under a lease between them. A trial before the court resulted in a judgment finding the issues in favor of defendant on both the first and second count of plaintiff's petition. After an unavailing motion for a new trial, plaintiff duly appealed.

The record shows that plaintiff, as lessor, and defendant, as lessee, on July 20, 1934, entered into a lease for ten years, commencing on July 21, 1934, and ending on July 20, 1944 (unless sooner terminated, as provided therein), covering premises known as the Ambassador Theatre, constituting a portion of the Ambassador Building located

at the northwest corner of Seventh and Locust Streets in the city of St. Louis, Missouri. The lease also covers the theatre portion of the building at the northeast corner of Grand Boulevard and Lucas Avenue in said city, known as the New Grand Central Theatre. A copy of the lease was attached to plaintiff's amended petition, upon which the case was tried, made a part thereof by reference, and marked Exhibit A. It was introduced in evidence by plaintiff.

Section 1 of Article II of the lease provides that the lessee shall pay to the lessor as rent for said premises a sum equal to fifteen per cent of the gross weekly cash receipts and income received by the lessee from the operation of the demised premises, but that the minimum weekly rental to be paid by the lessee under the terms of the lease shall be $2350 for the first two years of the term thereof, $2550 for the next succeeding three years, $2850 for the next succeeding three years, and $3050 for the next succeeding and final two years, except during the period in each year beginning May 15th and ending August 15th, during which periods the minimum weekly rental to be paid shall be $2350.

Article III of the lease provides that the lessee agrees, with respect to the Ambassador Theatre, to operate said building as a theatre continuously, except that at the option of the lessee it may close said theatre for a period of two weeks in any one year, in which event the lessee will pay a minimum rental of $2000 per week during the first two years, $2200 per week during the next succeeding three years, $2500 per week during the next three succeeding years, and $2700 per week during the final two years of the lease; and, in addition, the lessee may close said Ambassador Theatre for a period of three months or any part of such period between May 1st and September 1st in each year, and in the event the lessee does close said Ambassador Theatre for said last mentioned period, or any part thereof, it will pay lessor rental during said period while said Ambassador Theatre is closed of $3000 per week.

The lease contains six articles—all except one of which are divided into many sections declaring the rights, privileges, obligations and duties of the respective parties thereunder. We will refer only to such portions thereof as are deemed necessary to reach a proper conclusion in the case.

On July 30, 1936, a supplemental agreement was entered into by said parties which modified the lease of July 20, 1934. The supplemental agreement was attached to plaintiff's amended petition, marked Exhibit B, and by reference made a part of said petition. It was also introduced in evidence by plaintiff.

Said supplemental agreement provides, in paragraph 1, for an extension of the term of the original lease for an additional period of two years and forty days, so that the lease expires on August 31, 1946, instead of July 20, 1944. It also provides, in paragraph 5, for a

reduction of the percentage of the gross receipts, under. certain circumstances therein stated, and, in paragraph 6, that settlements instead of being made weekly, as provided in the original lease, shall be made quarter-annually.

In paragraph numbered 2 of the supplemental agreement it is provided that the weekly rental for the New Grand Central Theatre, to be paid in accordance with the terms and provisions of the original lease, shall be $350, "and the lessor hereby waives any rental based on a percentage of receipts in respect of the New Grand Central Theatre operations."

In paragraph numbered 3 of the supplemental agreement it is provided that the minimum weekly rental to be paid by the lessee to the lessor, in respect of the Ambassador Theatre, shall be $2000 per week for the first two years commencing on July 21, 1936, $2200 per week for the next succeeding three years, $2500 per week for the next succeeding three years, and $2700 per week for the next succeeding and final two years and approximately forty days of the extended term, all to be paid in accordance with the terms of the original lease.

In paragraph numbered 7 of the supplemental agreement it is provided that the lessee will exhibit in the Ambassador Theatre the best quality in box office value first run feature motion picture plays selected by it "as hereinafter provided, from all of the first run feature motion picture plays which it, or any of its affiliate, parent or subsidiary company or companies may now or at any time in the future have or license for first run exhibition in the City of St. Louis or County of St. Louis, Missouri, on an equal basis with the Fox Theatre in St. Louis, Missouri." It is further provided in said paragraph that throughout the term of the lease the lessee "will cause to be selected for each week the two first run motion picture plays which in its best judgment, from the standpoint of quality and box office value, are best pictures of all of the first run feature motion picture plays licensed to, owned or controlled by the Lessee, Fanchon & Marco Service Corporation, the affiliate or affiliates, parent or subsidiary companies of either of them available for first run exhibition in the City of St. Louis or County of St. Louis, Missouri, and one of said motion picture plays thus selected shall be exhibited at the Ambassador Theatre."

Said paragraph 7 of the supplemental agreement further provides:

"In order to obtain a fair and equal distribution for exhibition purposes as between the Fox and Ambassador Theatres, Lessee covenants and agrees that in the event that the Lessee shall present at the Ambassador Theatre a combination program of first run motion picture plays and vaudeville, stage shows or living stage attractions, and such vaudeville, stage shows or living stage attractions shall constitute a substantial part of the program exhibited at the said Ambassador Theatre, the first choice of the two best motion picture

plays selected as hereinabove provided may be allocated for exhibition at the Fox Theatre, and the second choice of such two best motion picture plays shall be allocated to and be exhibited at the Ambassador Theatre. In the event, however, that the Lessee of the Fox Theatre exhibits a combination program of first run motion picture plays, and vaudeville, stage shows or living stage attractions and such vaudeville, stage shows or living stage attractions constitute a substantial part of the program exhibited at the Fox Theatre, then and in that event the first choice of the two best motion picture plays selected as hereinbefore provided shall be allocated to and exhibited at the Ambassador Theatre and the second choice of said two best motion picture plays may be allocated for exhibition at the Fox Theatre. In the event that both the Lessee of the Fox and the Lessee of the Ambassador Theatre present at the said respective theatres programs consisting of first run feature motion picture plays and vaudeville, stage shows or living stage attractions, and the vaudeville, stage shows or living stage attractions presented as a part of the program in each of the theatres constitutes a substantial part of such program, or in the event that the vaudeville, stage shows or living stage attractions presented as a part of the program at both the Ambassador and Fox Theatres do not constitute a substantial part of the program presented at each of said theatres, then the allocation of pictures for the purposes of exhibition as between the Fox and Ambassador Theatres shall be as nearly as it is possible on an equal basis, and the first choice of the two best motion pictures shall be alternately allocated and exhibited in each one of the theatres each week.''

Paragraph 8 of the supplemental agreement provides:

''Lessor agrees that

'' (a)  So long as Lessee shall faithfully comply with the terms and provisions of the lease of July 20, 1934, as hereby amended; and

'' (b)  so long as Lessee and its parent or affiliate companies are in a position to and do make available for exhibition and exhibit at the Ambassador Theatre, on an equality with the Fox Theatre, the first choice of all of the first run feature motion picture product of at least four of the following named motion picture services (and any others that the Lessee, Fanchon & Marco Service Corporation, or any affiliate or parent company of either of them may at any time hereafter have or control for first run exhibition in the City of St. Louis or County of St. Louis, Missouri), to-wit: Paramount, Warner-First National, Twentieth Century-Fox, R. K. O., Columbia and Universal, provided that in the event any of the aforesaid services shall be combined, then for the purpose of this paragraph they shall be counted as individual services.

''The Lessee shall be entitled to deduct and retain out of the rental due Lessor from Lessee on account of the Ambassador Theatre the sum of One Thousand dollars ($1,000) per month, provided that the

Lessors of the Fox and Missouri Theatres shall be and remain obligated to pay the sum of Twelve Thousand dollars ($12,000) and Six Thousand dollars ($6,000) per annum, respectively, for the right to have allocated to each of said theatres first and second choice, respectively, of first run feature films. In the event that Lessor should for any reason refuse to permit the Lessee to deduct the sum of Twelve Thousand dollars ($12,000), as herein provided, the Lessor shall not be entitled to the preference of pictures as provided in paragraph 7 hereof but Lessor shall remain liable for such amount if Lessee is ready, willing and able to give Lessor such preference of pictures. If the Lessor of the Fox Theatre shall fail to pay to or on behalf of its Lessee the sum of Twelve Thousand dollars ($12,000) per annum, neither it nor its Lessee shall be entitled to share with the Lessee of the Ambassador Theatre in the selection and allocation of motion pictures for exhibition at the Fox Theatres as is provided in paragraph 7 hereof, and in such event Lessee agrees that the first choice of the two best motion picture plays selected for each week in the manner set forth in paragraph 7 hereof shall each week be exhibited at the Ambassador Theatre.''

The evidence shows without dispute that during the period from May 9, 1942, until August 1, 1942, the Ambassador Theatre was closed, and that during said period defendant, lessee, paid rental of $3000 per week, which was $1000 more per week than the rental would have been if the theatre had been open. It was admitted that during said period when the Ambassador Theatre was closed the sum of $2516.13 was deducted from the rent. Defendant, in its brief, states that it is not strictly accurate to say that the last-named amount was deducted; that what it did was simply to make the regular monthly deduction of $1000 during said period and that the sum of $2516.13 is merely the amount sought to be abated by plaintiff from the deduction. However, the record shows that plaintiff alleged said amount in paragraph 6 of Count I of its amended petition, and defendant in its answer thereto specifically admitted said paragraph 6. It was also admitted that from June 10, 1943 to July 21, 1943 the defendant, lessee, exhibited the same first run motion picture at the same time at both the Ambassador and Fox Theatres and that the sum of $1377.51 was deducted by defendant from the rent during that period.

Harry C. Arthur, Jr., who signed the supplemental agreement on behalf of defendant, lessee, as its president, was called as a witness for defendant and testified that he was vice-president and director of Fanchon & Marco, Inc.; that he participated in the negotiations at the time the original lease of July 20, 1934, was entered into between plaintiff and defendant; that said Fanchon & Marco corporation had a financial interest at that time in the St. Louis Ambassador Theatre, Inc., and that at the time of the supplemental agreement, on July 30,

1936, "they owned 100 per cent of the St. Louis Ambassador Theatre"; that before July 30, 1936, there was a very serious shortage of film products for all the theatres involved because Warner Brothers had opened the Orpheum and Shubert theatres, which had been closed for some time, and had taken the pictures that had previously run at other theatres and were showing them at the Shubert and Orpheum theatres. The witness testified:

"Q. Were there any other film companies that took away the products? A. There was Warner, First National, Paramount and R. K. O.

"Q. Did you make a settlement with the film companies in the spring of 1936? A. Yes, we made a settlement with the Paramount, R. K. O. and Warner-First National. .

"Q. And, on the part of Fanchon & Marco, that settlement involved what?"

At this point plaintiff objected on a number of grounds, which will be discussed later, but was overruled and saved its exceptions, whereupon the witness, referring to Fanchon & Marco, Inc., testified:

"We agreed to take over Warner Brothers interests in St. Louis and pay them five hundred and twenty thousand dollars for which they were to give us a ten-year franchise for Warner-First National pictures for exhibition in St. Louis, and R. K. O. agreed to give us a ten-year franchise for the exhibition rights of their pictures, and Paramount agreed to stipulate for a period of ten years they wouldn't refuse to sell us for any reason whatsoever except as to price, and Twentieth Century-Fox gave us a ten-year franchise for the showing of their pictures to induce us to accept the stipulation with respect to Paramount pictures.

"Q. In what company were these franchises lodged? A. In Fanchon & Marco Service Corporation.

"Q. Is that a wholly owned— A. (Interrupting) It is a wholly owned subsidiary of Fanchon & Marco and was organized for the management of all of Fanchon & Marco's holdings in the City of St. Louis, Missouri."

The witness further testified that the theatres in which Fanchon & Marco had an interest in St. Louis, in which said franchises could have been exercised, were the Fox, the Ambassador, the Missouri, the St. Louis, and the Grand Central, and that one or two of the franchises provided for the exhibition of said pictures in the Shubert and Orpheum theatres if they desired it; that in July, 1936, the St. Louis Theatre had been closed because the product it principally relied on, the R. K. O., had been taken away from it, but prior to that time it had been a first run house operated by Fanchon & Marco before Fanchon & Marco acquired the substantial interest in the lease of the Ambassador and Missouri theatres—Fanchon & Marco having operated both the Fox and St. Louis theatres at that time. The witness was

asked to explain the purpose of paragraph 8 of the supplemental agreement of July, 1936 (which we have heretofore set forth) with regard to the deduction of $1000 a month from the rental paid by the lessee to the lessor, and the contribution by the Fox Theatre of $12,000 per annum and the Missouri Theatre of $6000 per annum. Objection was made by plaintiff and overruled, exceptions to adverse rulings having been saved by agreement. The witness answered:

"The purpose was to have the interests in the St. Louis Theatre subordinate their rights to the first right pictures we acquired. The St. Louis Theatre had had R. K. O. pictures, and in order to work out an agreement with all these parties there were a lot of agreements with different interests, we were trying to satisfy everyone we could, and they were all signed about the same time, and each one had some bearing on the other, and the St. Louis Theatre interests, that is, the landlords of that theatre, claimed that because of the fact that the R. K. O. pictures had been previously shown by that theatre, in fact the St. Louis Theatre had been a R. K. O. operated theatre, wanted the settlement so made that the R. K. O. pictures would go back to the St. Louis Theatre, but that wasn't possible if we were going to divide between the Fox and Ambassador and set the Fox and Ambassador up as the two leading theatres and we proposed to have the St. Louis take a subordinate position and the theatres that were to benefit for the first choice grade, to pay the St. Louis Theatre thirty thousand dollars a year and to so divide twelve thousand to the Ambassador and twelve thousand to the Fox and six thousand to the Missouri, and it was the three theatres that were to benefit on the first call of these showing of these pictures."

The witness further testified that the $12,000 deducted from the rent wasn't kept by the lessee but was turned over to the St. Louis Theatre. He was asked to tell what happened to the money, and answered:

"A. The thirty thousand dollars was paid to the landlords of the St. Louis Theatre.

"By Mr. RICHARDSON: By whom?

"A. By Fanchon & Marco Service Corporation, which in turn got it from the Lessee, which in turn deducted it from the rent payable to the Lessor for the Ambassador Theatre.

"By Mr. LIBERMAN: Deducted twelve thousand dollars a year? A. Yes, sir, and they paid twelve thousand for the Fox and six thousand for the Missouri.

"Q. What was the name of the company? A. The interests of the St. Louis Theatre was the Grandel Theatre Company."

The witness testified at length concerning the practices and customs of the various companies engaged in producing, distributing and exhibiting motion pictures in relation to the moving picture situation, during the period involved, among the theatres in St. Louis,

as well as the conduct and operations of the lessor and lessee and of the Fanchon & Marco parent and subsidiary companies in the carrying out of the supplemental agreement involved herein. He stated that as the pictures became available the film producting companies would announce them for certain dates and he would then set up the booking of the Fox and Ambassador Theatres for four or five weeks at a time; that the film producers did not release pictures each week and he was required to keep in continuous negotiation with them to procure dates for the exhibition of the pictures other than the dates announced by the producers; that the film producers always hold their best pictures for exhibition at times when the exhibitors' business is good; that high quality pictures are required to be shown at both the Fox and Ambassador Theatres and are known as "A" pictures; that "A" pictures get the publicity and draw business to the theatres; that during many weeks the pictures released by the film producers are not suitable for exhibition at the Fox and Ambassador Theatres and then again pictures will come along of such outstanding quality that they call them "Double A"; that if they gave a picture to the Ambassador Theatre that demonstrated it wasn't as good as the one given to the Fox Theatre, the next time an allocation of pictures was made the Ambassador Theatre would be favored in order to keep the allocations on an even keel throughout the years. The witness stated that it was "utterly impossible" to make a selection each week of the best picture available for exhibition because the film producers do not release such pictures consistently. He also stated that the equality of allocation of best quality pictures was interfered with by the holding over for more than a week of some pictures in one or the other of the theatres involved. The witness was asked if he had given all the reasons why it would be impossible to allocate the pictures each week, and answered:

"There are times when the film producer refuses to give us the picture on the date you want it, regardless of the date you want it. I have had that happen to me several times. They don't want that week and they won't book that week. They don't like to play in the summer time or the week before Christmas, and they don't like to play during Holy week or during Lent, or in the middle of the summer, and the week before Christmas and Holy Week it is a Yeoman's job to get any pictures, that is, "A" pictures.

"Q. These "A" pictures are played on a percentage basis, are they not? A. Practically all of them, and that is the reason the producer is so concerned about the date he gets booked, because the dates his picture is played determines his income, as it does the income of the theatre.

"Q. What has been the policy in regard to holdover pictures? A. When we get a picture that we feel will give a satisfactory result we

hold it over for the second week, and on occasions we have held it over for the third week.

"Q. Have you done it at the Ambassador Theatre? A. Yes, at the Ambassador and the Fox and other theatres as well."

In relation to the summer of 1942, the witness testified:

"Q. As I understand, you had a shortage of pictures last summer? A. Yes, the summer of '42; in fact, we are faced with a shortage every summer, but it seemed particularly acute in 1942 and we decided to close one of the theatres.

"Q. You closed the Ambassador rather than the Fox? A. We had been faced with the situation once before and we closed the Fox and by closing the Ambassador Theatre we thought it was a 50-50 arrangement.

"Q. When did you close the Fox? A. Some two or three years previous to that when the situation was just as acute.

"Q. When you reopened the Ambassador in the summer of 1942 was there then an accumulation of any pictures available? A. There was an accumulation of three or four and we booked them into the Ambassador Theatre.

"Q. Did you make any effort to give the Ambassador any better, or worse, pictures after it reopened? A. I think, for a period of time, we gave the Ambassador better pictures, but when the year finally wound up it was about a 50-50 arrangement.

"Q. And that was regardless of the fact that the theatre had been closed? A. Yes."

Mr. Arthur explained the practice of allocating pictures to the Fox and the Ambassador Theatres in accordance with what he termed the "day and date" policy, saying that the day of the week is the "day", and the date of the month is the "date" meant by "day and date," and that when they refer to "day and date" it means that they run the pictures in the two theatres mentioned at the exact same time.

The witness further testified that the Fox Theatre was on Grand Avenue, near the St. Louis and Missouri Theatres and about three miles from the Ambassador Theatre, which was in the downtown business district in St. Louis; that the Ambassador Theatre had a greater field of pictures that women liked, because of women shoppers in the downtown district, whereas the Fox had a larger percentage of men; that if he had two class "A" pictures and one of them was of the action type, which would appeal to men, that one would be put in the Fox Theatre, and if the other would appeal more to women it would be put in the Ambassador Theatre.

On cross-examination the witness testified that Fanchon & Marco, Inc. was the parent company which wholly owned the Fanchon & Marco Service Corporation; that he was also an officer of the last named company, which was engaged in the business of managing

theatres; that the St. Louis Theatre Company was a "solely owned subsidiary of Fanchon & Marco, Inc."; that the lessee of the Fox Theatre was the Eden Theatre Company and "it is a solely owned subsidiary of the Fanchon & Marco"; that the St. Louis Amusement Company was lessee of the St. Louis Theatre; that another corporation called Fanchon & Marco Enterprise, Inc., which in turn was owned by Fanchon & Marco, Inc., owned 40 per cent of the stock of the St. Louis Amusement Company; that Fanchon & Marco (evidently Fanchon & Marco, Inc.) owned an interest, but not a controlling interest, in the Fox Theatre; that the Missouri Theatre was owned by the Missouri Theatre Building Corporation and that said company and the Ambassador Corporation (evidently Ambassador Building Corporation) had the same Board of Trustees, and both buildings were managed by Mr. Turley; that the St. Louis Theatre building was owned by the Grandel Theatre Company, 70 per cent of whose stock was owned by Fanchon & Marco. The Mr. Turley above referred to was an officer of the lessor, Ambassador Building Corporation, and had been "in this situation all the time" and was "very familiar with it."

The witness gave further testimony on cross-examination showing the manner in which the $30,000 made up from the contributions of the three theatres named in paragraph 8 (b) of the supplemental agreement finally was credited to the Grandel Theatre Company, owner of the St. Louis Theatre building. In this connection the witness testified:

"Q. At any rate Grandel finally becomes the beneficiary of the thirty thousand dollars, is that what you testified this morning? A. Yes.

"Q. And Fanchon & Marco owns, or controls, seventy per cent of the Grandel Realty Company? A. They own it but they don't control it because fifty per cent of the stock is tied up in a trust and is voted for the benefit of the bondholders, and the other fifty per cent which we own is also tied up with them so, as a matter of control, we don't control anything on Grand Avenue.

. . . . . .

"Q. The point I am getting at the Fanchon & Marco substantially benefits through one of the subsidiaries and the payment to another of the subsidiaries? A. No, that money is supposed to be the carrying charges, the Fanchon & Marco Company might be better off if they didn't have the St. Louis Theatre leased to the St. Louis Amusement Company, which was a part of this agreement we made in 1936. The people who made that agreement in 1936 when they agreed to pay twelve thousand dollars from one company and six in another, that thirty thousand dollars was to the St. Louis Theatre, but having the St. Louis Theatre leased to the Amusement Company that they owned fifty-two per cent of.

"Q. So the St. Louis Amusement Company is owned approximately equally by your interests— A. No, not approximately even, because we have nothing to do about it. .

"Q. As far as the ownership is concerned? A. No, because we have found out unless you own fifty per cent, you are not even ap-proximately equal.

"Q. The Grandel gets the thirty thousand dollars? A. Out of which they pay the interest due on the first mortgage, which is some-thing like seven hundred thousand dollars, and the taxes and insurance.

"Q. These are just debts? A. The thirty thousand is a just debt too."

Mr. Arthur further testified that they never had any complaint from the Ambassador Theatre Building Corporation with respect to holding over pictures, and that there was no particular complaint about the way he allocated pictures between the Fox Theatre and the Ambassador Theatre except the controversy herein; that plaintiff, lessor, however, did make a complaint about the allocation of the rental while the Ambassador Theatre was closed in 1942.

The witness was cross-examined in detail with respect to the method of allocating pictures during the years following the modification of the original lease by the supplemental agreement of July, 1936, and testified that the release date of the pictures would come through to him or Fanchon & Marco or the distributor from the producer from time to time; that the distributor is the agency that sells the pictures to the exhibitor for the producer; that in the year 1937 the release date would usually come through four or five or six weeks in advance, and then with respect to the Fox and Ambassador Theatres he would try to allocate the two best pictures—not alternately each week, but in groups of two or three or four at a time; that in 1937 from time to time he would have pictures available for exhibition in St. Louis. He testified at this point:

"Q: And you did operate in 1937 and didn't close either the Fox or the Ambassador, is that true? A. I don't know, we closed the Fox one year, I don't know the year off-hand.

"Q. You never closed the Ambassador until May the 9th, 1942, is that true? A. I think that's the date."

Continuing, the witness testified that he did his very best and followed what he thought was the intent of the contract and didn't remember any complaint from anybody; that in the Spring of 1942 pictures were released from time to time by producers for exhibition in theatres, the pictures being assigned between the two theatres according to the contract.

Concerning the allocation of pictures in 1942, Mr. Arthur testified:

"Q. And we come down to May the 9th, 1942, do you remember what day that was? A. Probably Thursday or Friday.

"Q. Had the producers then, those that you have mentioned, given you at least two pictures to play on that date, two first run pictures to play for the day following May the 9th? A. I don't think so.

"Q. You mean you didn't even have two pictures? A. Two pictures, yes, you always have pictures regardless of the quality.

. . . . . . .

"Q. During that time you did not select and allocate between the Fox and the St. Louis? A. Certainly I did, I did that all the way along.

"Q. Your Ambassador was closed during that period? A. Yes.

"Q. Even though, as you now admit, there were pictures available for selection and allocation between the Fox and the Ambassador? A. Not the type of pictures that could run in the theatre.

"Q. That was your opinion, wasn't it? A. No; I think it was the general opinion of the industry."

With respect to the closing of the theatre during the period mentioned, the witness further testified that he knew that the lessee under the written agreement had the right to close the Ambassador Theatre between May 1st and September 1st and that it was the lessee who elected to close it for reasons of its own: that the lessee did not consult any interests and didn't get the approval of Mr. Turley to close the theatre because the provision for closing was contained in the lease and the lessee paid $1000 bonus per week on the rental for the right to close.

The witness was shown a letter written and signed by Mr. Dysart on behalf of plaintiff, lessor, dated in May, 1943, and addressed to the witness personally, and testified that in said letter Mr. Dysart stated that the lessor would consider exhibition of picture under the "day and date" policy a breach of the agreement, that he, the witness, was disturbed about the letter because Mr. Turley had told him over the telephone that he didn't see how they (the lessor) could object to the "day and date" policy of picture allocation. The witness further stated that the landlord (lessor) not only didn't oppose the "day and date" policy but indicated that it had no basis upon which to oppose it, and the opposition from Mr. Dysart came in to the witness after all the arrangements had been made for operating under said policy; that arrangements to run "day and date" had to be made several weeks in advance and the arrangements had all been concluded and the pictures contracted for and terms arranged before the receipt of Mr. Dysart's letter. The witness concluded this part of his testimony under cross-examination as follows:

"Q. And in all of this, no matter what construction is taken of it, in all of this there wasn't any consent on their part to the deduction

of a thousand dollars a month during that period? A. I think they objected to it rather than consented to it.''

It is contended by plaintiff that the court erred in adjudging on the first count of plaintiff's petition that defendant had the right to deduct the sum of of $1000 per month from the rental due under the lease during the period from May 8, 1942, to August 1, 1942, when the Ambassador Theatre was closed. Plaintiff points out that paragraph 7 of the supplemental agreement provides that ''lessee covenants and agrees that throughout the term of the afore-mentioned lease it will cause to be selected for each week the two first run motion picture plays . . . and one of said motion picture plays thus selected shall be exhibited at the Ambassador Theatre,'' and that the last clause of the same paragraph provides that ''the allocation of pictures for purposes of exhibition, as between the Fox and Ambassador Theatres, shall be as nearly as it is possible on an equal basis, and the first choice of the two best motion pictures shall be alternately allocated and exhibited in each one of the theatres each week.'' Plaintiff then refers to paragraph 8 of the supplemental agreement wherein the lessee is given the right to deduct out of the rental due the lessor the sum of $1000 per month, and argues that said deduction is allowable only '' (a) So long as Lessee shall faithfully comply with the terms and provisions of the lease of July 20, 1934, as hereby amended; and (b) so long as Lessee and its parent or affiliate companies are in a position to and do make available for exhibition and exhibit at the Ambassador Theatre, on an equality with the Fox Theatre, the first choice of all of the first run feature motion picture product of at least four of the following named motion picture services . . .'' Plaintiff asserts that inasmuch as it is admitted that the Ambassador Theatre was closed from May 9, 1942, to August 1, 1942, during which period no pictures were exhibited therein, there was no right to deduct rental during that period; that the right to deduct exists only so long as pictures are actually exhibited each week at the Ambassador Theatre. Plaintiff argues that the reason for such a provision is not relevant or material in this case, but that if the reason therefor were a pertinent inquiry it is clear that it was greatly to the interest of the lessor that the theatre remain open and actually exhibit pictures. In this connection plaintiff points out that the rent was payable on a basis of 15 per cent of the lessee's gross weekly cash receipts and income from the operation of the premises, and that under the supplemental agreement the minimum weekly amount payable for the period May 9, 1942, to August 1, 1942, was substantially less than the minimum weekly rental under the original lease, and argues that it clearly appears that the lessor was willing to permit the reduction of $1000 per month only so long as pictures were actually exhibited with the theatre actually open and receipts flowing in. Plaintiff concedes that defendant had the right to close the theatre during the period mentioned

by paying, as a penalty for doing so, $3000 per week while it was closed instead of $2000, the minimum rental, or 15 per cent of the actual gross receipts if the receipts exceeded the minimum rental, but insists that if defendant exercised such option it must forego the right to the $1000 a month deduction.

We are unable to agree with plaintiff's contentions. We think such contentions ignore the peculiar situation of the parties and their mutual intentions as evidenced by the complicated provisions they made in paragraphs 7 and 8 of the supplemental agreement, as well as their operations and conduct in carrying out the lease and supplemental agreement for a period of more than six years before this controversy arose. In 13 Corpus Juris, sec. 482, p. 521, it is said:

"The primary rule in the construction of contracts is that the court must, if possible, ascertain and give effect to the mutual intention of the parties, so far as that may be done without contravention of legal principles. *Greater regard is to be had to the clear intent of the parties than to any particular words which they may have used in the expression of their intent.*" (Emphasis ours.) [See also, 17 C. J. S. Contracts, sec. 295a, p. 689.]

The right to deduct $1000 per month from the rent given to the defendant, lessee, is found in paragraph 8 of the supplemental agreement. By that paragraph the lessee is required to be in a position to and make available for exhibition and exhibit at the Ambassador Theatre on an equality with the Fox Theatre the first choice of all the first run feature motion picture products of at least four of seven motion picture services named. The provision for allocation each week is referred to only incidentally in the last sentence of the section. The substantial and important provisions thereof which constitute the very heart of the agreement, when considered as a whole, deal with the question of equality of the Ambassador Theatre and the Fox Theatre in relation to the exhibition of first choice of first-run feature motion picture products. The clearly predominant idea of equality in dealing with those two theatres is also evidenced in paragraph 7 of the supplemental agreement wherein it is provided: "the lessee agrees that it will exhibit in the Ambassador Theatre the best quality and box office value first run feature motion picture plays selected by it from time to time, as hereinafter provided, . . . on an equal basis with the Fox Theatre in St. Louis, Missouri."

It is necessary again to refer to that part of paragraph 8 of the supplemental agreement which provides:

"The Lessee shall be entitled to deduct and retain out of the rental due Lessor from Lessee on account of the Ambassador Theatre the sum of One Thousand dollars ($1000) per month, provided that the Lessors of the Fox and Missouri Theatres shall be and remain obligated to pay the sum of Twelve Thousand dollars ($12,000) and Six Thousand dollars ($6000) per annum, respectively, for the right to

have allocated to each of said theatres first and second choice, respectively, of first run feature films. In the event that Lessor should for any reason refuse to permit the Lessee to deduct the sum of Twelve Thousand dollars ($12,000), as herein provided, the Lessor shall not be entitled to the preference of pictures as provided in paragraph 7 hereof but Lessor shall remain liable for such amount if Lessee is ready, willing and able to give Lessor such preference of pictures.''

The above peculiar paragraph of the supplemental agreement is more than a right given to the lessee to deduct rent. It is, by the very terms thereof, and as shown by the undisputed testimony of Mr. Arthur, also, in reality, an obligation of the lessor to make a contribution of $12,000 per annum for the preferential rights granted, and in addition thereto it is an obligation of the lessor of the Fox Theatre to make a similar contribution for first choice of first run feature motion pictures, plus an obligation of the lessor of the Missouri Theatre to make a contribution of $6000 per annum for the second choice of such motion pictures.

It is clearly evident from the language of paragraph 8 that the lessor and lessee had a very definite intention to do considerably more than merely to make a lease between themselves. It is the duty of the court to ascertain such intention and give it effect. The modern rule on this question is stated in Wigmore on Evidence (3 Ed.), section 2470, page 227, as follows:

''Once freed from the primitive formalism which views the document as a self-contained and self-operative formula, we can fully appreciate the modern principle that the words of a document are never anything but indices to extrinsic things, and that therefore *all the circumstances must be considered which go to make clear the sense of the words,*—that is, their association with things.'' (Emphasis author's.)

In 12 Am. Jur., Contracts, sec. 227, pages 745 and 748, it is said: ''Generally speaking, the cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles. . . . In other words, the object to be attained in interpreting a contract is to ascertain the meaning and intent of the parties as expressed in the language used.''

In Paisley v. Lucas, 346 Mo. 827, 839, 143 S. W. (2d) 262, 268, our Supreme Court, speaking of the intention of the parties to a contract, said:

''For the purpose of determining the intention of the parties and reaching a construction that is fair and reasonable under all the facts and circumstances, *the court may consider the relationship of the parties, the subject matter of the contract, the usages of the business,*

*the surrounding facts and circumstances attending the execution of the contract and its interpretation by the parties.''* (Emphasis ours.)

Under the above-mentioned modern rule we believe that the action of the court in permitting the witness Arthur to testify with respect to the position and relationship of the two parties to each other and to the several other corporations named in their supplemental agreement, as well as their conduct in operating under the lease and agreement, was not error, as contended by defendant. On the contrary, we believe that such testimony was necessary to explain the complicated arrangement made by the parties to make it possible for the court to understand their purpose and intent. Without the testimony of Mr. Arthur, or of some other witness competent to give such testimony, neither the circuit court nor this court would be in a position to ascertain such intent.

According to Mr. Arthur's testimony the peculiar provisions of the supplemental agreement, particularly paragraphs 7 and 8, arose from the fact that Fanchon & Marco, Inc. had made a settlement in St. Louis of what was referred to as the film war, and was conducting its operations through its subsidiaries, the Ambassador, the Missouri, the Fox, and the St. Louis Theatres. Mr. Arthur's testimony was merely explanatory of the relationship of the parties and showed the facts and circumstances under which the lease and agreement were made and carried out by the two parties thereto and the other corporations named therein who were not directly named as parties but were known to be subsidiaries of Fanchon & Marco, Inc. We have set forth said testimony at considerable length and find nothing therein which constituted an attempt to vary the terms either of the written lease or the written supplemental agreement. The undisputed evidence shows that the closing of the Ambassador Theatre from May 8, 1942, to August 1, 1942, was caused by a serious shortage of first quality pictures. The same condition had occurred in a previous year at which time the Fox Theatre had been closed, without complaint from anyone. This shows that the parties understood and agreed that equality of treatment of the two theatres was the supreme objective of their arrangements. The right of defendant to close the Ambassador Theatre during the period mentioned is specifically granted in Article III of the lease, but it is required to pay $1000 per week as a penalty therefor. There is, however, no provision, specific or otherwise, in either the lease or the supplemental agreement for abatement of the right to deduct the $1000 per month from the rental during such period. If the parties had intended to allow for abatement of the deduction of rental during the closed period they undoubtedly would have so provided, just as they provided for the increased rental during such period. Furthermore, during the period involved plaintiff not only did not suffer any loss or damage, but on the contrary it actually received $12,000 more for the twelve weeks

the theatre was closed than it would have received if it had been open, for the evidence shows that the percentage provided for did not equal the minimum rental during 1942 and 1943, and that the business always fell off in the summertime. Under all the terms of the lease and supplemental agreement, and the undisputed evidence of Mr. Arthur, we are of the opinion, and so hold, that the defendant is entitled to deduct the amount of $1000 per month from the rental due for the period May 9, 1942, to August 1, 1942, when the Ambassador Theatre was closed, during which period defendant paid to plaintiff $1000 per week as a penalty for closing.

Plaintiff next contends that the court erred in adjudging on the second count that defendant was entitled to deduct the sum of $1000 per month from the rent due under the lease during the period from June 10, 1943, to July 21, 1943. In support of this contention plaintiff points out that paragraph 7 of the supplemental agreement provides that the first choice of the two best motion pictures, as between the Fox and Ambassador Theatres, shall be "alternately allocated and exhibited in each one of the theatres each week," and that it was admitted that the above provision was not complied with in that the pictures during said period were not alternately allocated and exhibited but were exhibited "day and date" at the two theatres, which means simultaneously. From this viewpoint, plaintiff argues that defendant was not entitled to deduct the $1000 per month rental because that right existed only so long as the above named condition in paragraph 7 of the supplemental agreement was faithfully complied with. Plaintiff further contends that the difficulty or even impossibility of performance does not excuse performance when a right is sought to be enforced based upon such performance unless the parties have agreed in the contract that performance under such circumstances may be excused, or unless performance is forbidden by law; that since performance in accordance with the paragraph mentioned is not forbidden by law, and since there is nothing in the agreement excusing performance, defendant is not entitled to deduct the rent under the circumstances. The above principles are correctly stated by plaintiff, as shown by the cases it cites in support of its point, but we believe that they are not applicable to the unusual facts and agreement in the case at bar. We are of the opinion that the case at bar is not one involving excuse for nonperformance by defendant, but that under the facts and the agreement there was substantial performance of the lease and agreement by defendant.

Plaintiff states that the reason for the provision for alternate allocation of pictures to one of the two theatres each week, in paragraph 7 of the agreement, is irrelevant; that the fact that it is in the agreement is sufficient to require its enforcement; that the contract in its entirety shows by its terms that it was the desire of the lessor that the Ambassador Theatre be kept open and that one of the two best pictures

be alternately exhibited there each week, and that only if that were done would the lessee be entitled to a deduction of $1000 per month from the rent.

Again we must say that we are unable to agree with plaintiff's contentions. There are two conditions in paragraph 8 of the supplemental agreement which are required to be performed by the lessee, as follows:

"(a) So long as Lessee shall faithfully comply with the terms and provisions of the lease of July 20, 1934, as hereby amended; and

"(b) so long as Lessee and its parent or affiliate companies are in a position to and do make available for exhibition and exhibit at the Ambassador Theatre, on an equality with the Fox Theatre, the first choice of all of the first run feature motion picture product of at least four of the following named motion picture services . . ."

We need not discuss the above named condition (a), for it is not contended that the "day and date" method of exhibition at the Ambassador Theatre violates any provision of the original lease.

The above named condition (b) requires that the lessee and its parent or affiliate companies are in a position to and do make available for exhibition and exhibit at the Ambassador Theatre "on an equality with the Fox Theatre" the first choice of all the first run feature motion picture product, etc. Certainly the exhibition on the same day and date of the same picture in both the Ambassador Theatre and the Fox Theatre constitutes an exhibition at the Ambassador Theatre "on an equality with the Fox Theatre." As to the "alternate" allocation referred to in paragraph 7 of the supplemental agreement, it appears that said provision was intended to cover the situation where stage shows are being given at one or the other of said two theatres. Even in the carefully expressed detail of said paragraph setting up the method to be followed in relation to stage shows, equality in the treatment of both theatres is clearly the supreme purpose of the two parties. That purpose is expressly stated in the following language in said paragraph 7:

"In order to obtain a fair and equal distribution for exhibition purposes as between the Fox and Ambassador Theatres, Lessee covenants . . ."

Then follow provisions declaring what shall be done when the Ambassador Theatre presents a combination program of first run motion picture plays and stage shows and the stage shows constitute a substantial part of the program exhibited at that theatre, after which said paragraph provides what shall be done in the reverse of that situation, namely, where the Fox Theatre exhibits a combination program of first run motion picture plays and stage shows and the stage shows constitute a substantial part of the program exhibited at that theatre, following which come provisions declaring what shall be done in the event both theatres present programs consisting of first

run feature motion picture plays and stage shows and such stage shows constitute a substantial part of the program in both theatres, or in the event that such stage shows in both theatres do not constitute a substantial part of the program, in which two last named events the allocation of pictures as between the two theatres ''shall be as nearly as it is possible on an equal basis.'' Said paragraph 7 then concludes with the provision: ''and the first choice of the two best motion pictures shall be alternately allocated and exhibited in each one of the theatres each week.'' It will thus be observed that equality of treatment of the two theatres is the main purpose sought to be accomplished and the alternate allocation is merely incidental. Furthermore, it will be observed that the simultaneous exhibition of the same picture in the two theatres complies with the conditions of paragraph 8 as to the equality of treatment of said theatres, and that it is in said paragraph 8 that the lessee is given the right to make the deduction of the rent. The right to deduct is clear, unequivocal and explicit, and, as we view it, cannot be defeated by other provisions in the agreement unless such other provisions expressly provide therefor. We find no such provisions therein—express or otherwise.

The manner in which the parties operated under the lease and the agreement, as testified to by Mr. Arthur, the only witness who testified in the case, shows that the parties themselves gave their lease and agreement a practical construction to carry out their purpose of equality of treatment of the Ambassador and Fox Theatres. According to Mr. Arthur's testimony quite a large number of pictures were ''held over'' from time to time during the more than six years of operation under the lease and agreement, and this was done without any objection from the lessor. He also testified that many weeks sometimes passed without the release of pictures by the film producing companies that would measure up to ''A'' pictures, following which five or six ''A'' pictures would be released for exhibition in a particular week. It is clear that under such conditions alternate allocation each week of these best pictures would defeat the supreme intention and purpose of the parties to treat the two threatres equally. It is evident from the conduct of the business of distributing and exhibiting motion pictures of the first class quality, required by the agreement to be exhibited in the two theatres, that alternate allocation each week was considered by the parties to be subordinate to the requirement of allocation of pictures ''on a basis of equality'' to the two theatres.

We think that the only reasonable interpretation of the agreement leads inescapably to the conclusion that alternate allocation each week was considered by the parties as a subordinate provision. Viewed otherwise, the defendant, lessee, would have the right to exhibit pictures, at the two theatres alternately each week regardless of the quality

of such pictures, contrary to the declared purpose to have the two theatres supplied with first class first run pictures. Under the interpretation contended for by plaintiff, when more than two first quality pictures are available in a particular week, defendant, lessee, could exhibit pictures of "A" and "Double A" quality frequently at the St. Louis Theatre on early release dates, the same as at the Fox and Ambassador Theatres, which would thereby put the St. Louis Theatre on the same basis as the Fox and Ambassador Theatres. That result would be in direct conflict with the clear intention of the two parties to make the Fox and Ambassador Theatres the two first class first run motion picture houses, with the St. Louis Theatre occupying a subordinate position in consideration of which it receives thirty thousand dollars a year from the Fox, the Ambassador, and the Missouri Theatres.

Plaintiff argues that because of the percentage provisions in the lease it might well have suffered a loss as a result of the simultaneous exhibition of the same pictures in the two theatres at the same time. Defendant introduced evidence showing that, regardless of "what might have been" the actual gross receipts from the pictures. exhibited "day and date" at the Ambassador Theatre in the six week period from June 9, 1943, to July 21, 1943, the period involved in the second count herein, totaled $80,146.40, whereas the receipts from the pictures shown at said theatre in the six week period immediately preceding the "day and date" exhibitions was $75,580.71. It thus appears that plaintiff did not suffer any actual damage whatsoever because of the "day and date" exhibition of pictures.

A careful consideration of the lease and agreement, and of the evidence, in the case at bar, leads to the conclusion that defendant is entitled to deduct from the rent the amount involved in the second count because of its substantial performance of the terms and conditions of said lease and agreement. There is considerable authority in support of the rule that a party must fully perform the stipulations on his part before the other party is obligated to perform, unless the promises are independent, but that is not the modern rule. We find in 12 Am. Jur., Contracts, sec. 343, p. 900, the following:

"A more liberal rule is, however, supported by much authority and the trend is toward this latter rule. Thus, it is said that the law looks to the spirit of a contract and not the letter of it, and that the question therefore is not whether a party has literally complied with it, but whether he has substantially done so. Similarly, other courts state that substantial, and not exact, performance accompanied by good faith is all the law requires in the case of any contract to entitle a party to recover on it."

We find the same doctrine stated in 5 Page on Contracts, section 2778, page 4913, as follows:

"In modern law the equitable theory rather than the original common-law theory has prevailed, and it is held by the great weight of

authority that recovery may be had without strict and literal performance, if the party who seeks to recover can show substantial performance.''

The same authority, in Section 2981, page 5266, says:

''It is not the breach of every covenant of a contract that may operate as a discharge of the adversary party. To have this effect the covenant broken must be a vital term of the contract, . . . Breach of a minor and subsidiary covenant may give rise to an action for damages but it can not operate as a discharge.''

We hold that under the terms of the lease and the supplemental agreement, and the evidence, the circuit court reached the right conclusion on each of the two counts of plaintiff's amended petition, and the judgment as to each of said counts is accordingly affirmed. *Hughes, P. J.,* concurs; *Anderson, J.,* did not participate in the decision of this case.