O. H. KERKEMEYER, Ben H. Gist, Earl C. Tolbert, L. Guy Scroggins, Henry Geers, W. H. Jones, A. B. Craig, and Ray D. Hough, Appellants,

v.

S. R. MIDKIFF, George Lowe, and Otis Mc-Gurdy, and all other members of Journeymen Barbers International Union of America, Local No. 191, Respondents.

No. 7365.

Springfield Court of Appeals.

Missouri.

July 29, 1955.

Turner White, III, Springfield, Chinn & White, Springfield, for appellants.

Neale, Newman, Bradshaw, Freeman & Neal, F. B. Freeman, Donald J. Hoy, Springfield, for respondents.

McDOWELL, Presiding Judge.

This is an action for declaratory judgment instituted in the Circuit Court of Greene County, Missouri, by eight barbers who are owners and operators of separate barber shops in Springfield, against defendants, members and officers of Journeymen Barbers, Hairdressers, Cosmetologists and

Proprietors International Union of America, Local No. 191, affiliated with the American Federation of Labor, to have judicially determined the rights of the parties under collective bargaining agreements between each of plaintiffs and defendants' union and to enjoin defendants from removing or threatening to remove union shop cards from plaintiffs' places of business and for damages.

The cause of action is based upon breach of the collective bargaining agreement and the conditions contained on the back of the union shop card furnished plaintiffs by the union as incident to such collective bargaining agreement, growing out of a demand made by defendants' union against each of plaintiffs; that they become members of such union or surrender the union shop card.

The regular Judge of the Greene County Circuit Court disqualified and Honorable James P. Hawkins, Judge of the 18th Judicial Circuit, was called in.

Motions for judgment on the pleadings were filed by both plaintiffs and defendants and on the 23rd day of March, 1954, the court sustained defendants' motion and dismissed plaintiffs' petition. Plaintiffs appealed.

It is the contention of plaintiffs that the right to require the return of the union shop card presupposes a lawful right and that the sole and only point of dispute in this case is whether plaintiffs must join defendants' union as a condition to their rights to obtain and display such card; that defendants' demand that plaintiffs join defendants' union on threat of coercive action is not a lawful labor objective and destroys plaintiffs' rights in collective bargaining and their freedom of contract; that such demand is against the public policy of Missouri.

It is defendants' contention that the shop card is the sole property of the union furnished plaintiffs by virtue of a written contract between plaintiffs and defendants, showing defendants approved plaintiffs' shops; that defendants no longer are obligated to extend this approval because plaintiffs each have violated the terms of the collective bargaining agreement, and, under the terms of the contract, defendants are entitled to remove the card from plaintiffs' shops.

The facts decisive of the issues presented are: Plaintiffs each are proprietors of a barber shop in Springfield and each employ one or more barbers, members of defendants' union, Local 191; that for many years each of plaintiffs have conducted a union shop under a collective bargaining agreement with defendants' union (a copy of such agreement is in evidence as plaintiffs' exhibit A); that by the terms of said collective bargaining agreement the defendants' union is the sole bargaining agent for all employees and by its terms only members of local union 191 in good standing are employed.

It is provided that the agreement shall remain in force for a period of one year from the date thereof and thereafter for a like period successively unless terminated by mutual consent of the parties.

The union furnished each of plaintiffs its shop card, the withdrawal of which forms the basis of this controversy. It is a small metal backed card bearing on its face in red letters the words, "Union Shop". As a part of the agreement between the union and plaintiffs, plaintiffs were required to exhibit this card in their respective places of business. The agreement governing the use of the shop card was printed on the back thereof. A part of said conditions so printed were:

"* * * that the person or persons displaying the Shop Card shall specifically agree:

"(a) To abide by the laws of the J.B.H. C.P.I.U. of A. governing Shop Cards and such laws as may be made in the future for the proper government of the same.

"(b) To abide by the laws of the local union, now and in the future, with reference to prices, hours, wages, and working conditions.

"(c) To peaceably give up said Shop Card on demand of the local union or local executive board, through its duly appointed representative, for the violation of any local or International laws.

"(d) To peaceably give up said Shop Card * * * for any cause, when called upon to do so."

For many years each of plaintiffs operated as a union shop under the collective bargaining agreement with defendants' union, local 191. No dispute had arisen between plaintiffs and defendants or plaintiffs and their employees with regard to wages, hours and conditions of labor; that plaintiffs and their employees, all of whom are members of said local No. 191, are operating harmoniously under said collective bargaining agreement. Up until 1948, plaintiffs were not required by the laws, regulations and constitution of defendants' union, to become members thereof.

In September, 1948, the constitution of the union was amended to take effect January 1, 1949, and, subsequently in September, 1953, it was again amended, effective January 1, 1954.

Under Article VII, Sec. 1, it is provided that the barber shop cards are and always shall remain the property of the International Union and shall be the only card recognized as legal by the union.

Sec. 3 reads: "Any shop recognized as a union shop by the laws and principles of our union shall be entitled to display said Shop Card, provided that the proprietor or person duly authorized to conduct said shop shall have signed the agreements required by these laws.

"When the Union Shop Card is removed from any shop for violation of the laws, rules, regulations and agreements, all members employed therein shall immediately leave the employment of said shop. For failure to comply with the above the member or members will be subject to suspension and to penalties as provided for in Article XIII of this Constitution."

Section 5 of Article VII reads: "No Shop Card shall be displayed in a barber or beauty shop unless all persons working in the shop with the tools of the trade are members of the union in good standing. * * *"

In our opinion we will refer to appellants as plaintiffs and respondents as defendants.

Under plaintiffs' allegations of error it is first contended that the trial court erred in sustaining defendants' motion for judgment on the pleadings because defendants' demand that plaintiffs join the union is an unlawful labor objective and destroys plaintiffs' right in collective bargaining and freedom to contract.

The law is well settled that each case must be determined upon the facts of that particular case. Spears v. Schantz, Mo.App., 246 S.W.2d 399, 406.

In deciding the issue raised by plaintiffs under this allegation we must determine from the facts the objective of the union in removing the union card from plaintiffs' businesses and whether or not that objective is reasonably related to any legitimate interest of organized labor.

The law is undisputed that concerted union activity for an objective which is not reasonably related to any legitimate interest of organized labor will be enjoined. Safeway Stores, Inc., v. Retail Clerks International Ass'n, 41 Cal.2d 567, 261 P.2d 721, 725.

The evidence is undisputed that for many years each of plaintiffs' shops have been conducted as union shops, operating under a collective bargaining agreement with defendants' union, employing only members of said union and complying with the regulations relative to wages, hours and conditions of employment as provided in such contract; that defendants' union was and is the bargaining agent for all of its employees.

As an incident to the execution of the bargaining agreement between plaintiffs and defendants' union, the union loaned to each of plaintiffs its shop card, a metal backed

card bearing on its face, in red letters, the word "Union Shop", for such time and on such conditions as are provided on the back thereof. As a part of the agreement plaintiffs were required to exhibit this card in their respective places of business. Under the terms of the agreement plaintiffs agreed that they would abide by the rules governing shop cards. These rules required that the plaintiffs abide by the laws of the J.B. H.C.P.I.U. of A. governing shop cards and such laws as may be made in the future for the proper government of the same; that plaintiffs peaceably give up such shop cards on demand of the local union for the violation of any local or international laws.

The constitution of the union was amended so as to provide "No Shop Card shall be displayed in a barber or beauty shop unless all persons working in the shop with the tools of the trade are members of the union in good standing. * * *"

It is admitted that each of plaintiffs refused to join the union and that each of them are barbers working in their shops with the tools of the trade. Demand has been made by the union against each of plaintiffs that they become members of the union or surrender the union card. The labor objective here is to compel each of plaintiffs, who work with the tools of the trade in their business as barbers, to become members of defendants' union or surrender the union shop card, which, in itself, has no value but is a symbol of union recognition of such shop. Under the terms of the shop card agrement each of plaintiffs' employees will be required to discontinue their work for plaintiffs. There is no threat of a strike but each of plaintiffs' shops will be branded "non-union" and stand to suffer damage from loss of trade from union members and their friends.

■ The written agreement, between each of plaintiffs and defendants' union, which required that plaintiffs abide by the laws of the local union now and in the future, should be given a liberal construction to mean that plaintiffs were bound to abide by all reasonable and legal laws adopted by the union but plaintiffs would not be bound in the future to abide by illegal enactments of the union or laws so unreasonable as not to have been within the contemplation of plaintiffs and the union at the time the agreement was made. See dissenting opinion in Foutts v. Journeymen Barbers, Hairdressers & Cosmetologists' International Union of America, Local No. 105, 155 Ohio St. 573, 99 N.E.2d 782, 787.

■ The law seems to be well established that a union may lawfully picket to compel employers who work at the trade to become members of the union. Riviello v. Journeymen Barbers, Hairdressers and Cosmetologists' International Union of America, Local No. 148, 88 Cal.App.2d 499, 199 P.2d 400, 403.

In this case, 199 P.2d on page 403 of the opinion, the law is stated:

"* * * Here the agreement does not attempt to compel the employer to join an employer organization, but it attempts to compel such employer, who works at the trade in competition with union members, to join an employee organization. That is clearly a proper labor objective, and is for the 'mutual aid or protection' of employees as provided in § 923 of the Labor Code, the section declaring the state policy on such questions. The effort to organize all barbers who work in the trade is clearly a legitimate interest of the barbers' union. It is evident that an employer-worker is in competition with all other barbers who are not employers. Without being subject to union sanctions for violating the wages, hours and conditions of employment imposed on union members, the employer-worker could gain a great advantage to the detriment of the union members." Cafeteria Employees Union, Local No. 302 v. Angelos, 320 U.S. 293, 64 S.Ct. 126, 88 L.Ed. 58; Coons v. Journeymen Barbers, etc., 222 Minn. 100, 23 N.W.2d 345.

In the latter case the Supreme Court of Minnesota, discussing the Angelos case, concluded that such case stands for the

principle that it was a lawful labor objective to attempt to compel an employer-worker to become a member of the union.

Plaintiffs cite Purcell v. Journeymen Barbers and Beauticians International Union of America, Local 192–A, 234 Mo.App. 843, 133 S.W.2d 662, 668, to sustain their contention that the demand for the return of the union card was not a proper labor objective.

This was an equity action decided by the Kansas City Court of Appeals, where the owner of a beauty shop sought to enjoin the picketing of her business by Journeymen Barbers and Beauticians International Union and the Hairdressers Guild, an organization of beauty shop owners. The court passed upon two questions. The first question related to lawful picketing which is not an issue in the instant case. The second question was as to unlawful conspiracy to fix minimum prices for beauty work and to force plaintiffs to join the Hairdressers Guild and to agree on minimum prices fixed by them.

In passing upon the latter question the court determined the purpose of the picketing and made this statement: "Was the purpose of the picketing, as plaintiff contends, to force plaintiff to join the Hairdressers Guild and to agree to minimum prices fixed by the Guild, or was it to further a genuine labor dispute between the Beauticians Union and the plaintiff with respect to wages, hours, or other conditions of employment?"

The court stated if it were the latter then the union was employing legitimate means so long as the picketing was lawful and that was true even though, as an incident thereto, plaintiff's business should sustain injury. (Citing authority.) We think that this is not an issue in the instant case. The question before us is whether or not it is a legitimate labor objective to enforce the written contract between plaintiffs and defendants' union to join the union or peaceably surrender the union shop card. It has nothing to do with picketing or unlawful combinations between unions to force plaintiffs to join defendants' union. The question of the removal of the union card was not before the court and we think this case is no authority for plaintiffs' contention.

Safeway Stores, Inc., v. Retail Clerks International Ass'n, 41 Cal.2d 567, 261 P.2d 721, is relied upon by plaintiffs. This case, likewise, did not involve the removal of the union shop card as in the instant case. It was an action to enjoin striking activities of the defendants' union from engaging in concerted activities to compel plaintiff to require union membership of its store managers in the local union or to bargain to that end with the store managers or with the union on their behalf. It will be noted in this case that by-laws of the local unions provided that only members not having the right to hire or fire shall be eligible to, or shall hold office. In other words, if the managers of plaintiff had been forced to join the union, their membership would have been a sterile membership. We think the courts of the different states, which have passed upon this question, almost unanimously have held that the demand of this kind of membership by a union constitutes an improper labor objective. The court held that the unions' activities in seeking recognition for local retail store managers, who were supervisory employees, were not reasonably related to any legitimate interest of organized labor, were not in furtherance of any proper labor objective, and, as a matter of sound public policy, were enjoinable within equity jurisdiction of the court. It stated that the court had within recent years declared the public policy of the state within the particular field herein involved and that it was against public policy to force the managers to join the union.

We have cited Riviello v. Journeymen Barbers, Hairdressers and Cosmetologists' International Union of America, Local No. 148, 88 Cal.App.2d 499, 199 P.2d 400, 403, which passed upon the specific question in the instant case and held that it was a proper labor objective for a union to compel the employer who works at the trade in competition with union members to join the organization. Under the facts in the Safe-

way Stores, Inc., case, supra, where the membership in the union was a sterile membership there could be no question but what there was not a proper labor objective.

Likewise, we think that public policy as to the question in the instant case has not been determined in Missouri, either by our Constitution or by legislative enactment, neither has such policy been determined by our courts as was stated in the California case.

Plaintiffs cite Hughes v. Kansas City Motion Picture Machine Operators, Local No. 170, 282 Mo. 304, 221 S.W. 95.

We think this case is clearly not in point. It was an action to enjoin picketing by a labor union against the owner and operator of a picture show. The court found that the picketing was of such a nature as to amount to a private nuisance; that it amounted to a boycott. The court made this statement on page 99 of 221 S.W. of the opinion:

"* * * The courts of review of this state have declared peaceable picketing is lawful and cannot be enjoined; but the instances were where the legality of the act was determined with reference to the effect of the absence of intimidation by violence and threats, and not with reference to the harassment of the complainants and the damage to their business by the manner in which the picketing was done. Intimidation happened in the present case, as we have stated; and in consequence of it and of the propaganda conducted by the pickets in defaming the behavior of plaintiffs to organized labor, much damage was inflicted on them, * * *."

In a concurring opinion, Judge Graves made this statement:

"* * * The real question in this case is whether or not a man, under the law, can run his own business, or shall it be run for him by a local union? * * *

"* * * The meat of this case lies in the one fact that this local union could not legally enforce its rule to the effect that no owner of a picture show business could operate his own machine, and enforce such rule by the picketing, and destruction of the business of any owner who would not assent to the rule."

We think this case is distinguishable from the instant case.

Plaintiffs cite Dorchy v. Kansas, 272 U.S. 306, 47 S.Ct. 86, 87, 71 L.Ed. 248, in which the court stated: "The right to carry on business—be it called liberty or property— has value. To interfere with this right without just cause is unlawful."

This authority can be of little assistance to plaintiffs. The question this court must decide is, whether or not the written contract between the parties is enforceable. It does not deny plaintiffs the right to carry on their business but defendants' union merely contends that they have the right to withdraw their recognition of plaintiffs' shops by withdrawing the shop card. They are not picketing. They are not attempting to deprive plaintiffs from operating their shops. If the act of withdrawing the card is lawful the question of result and injury, which might follow the removal of the card, cannot prevent the enforcement of a legal contract.

Plaintiffs cite Article I, Sec. 9 of the Constitution of Missouri, V.A.M.S. We think this does not aid plaintiffs.

In Foutts v. Journeymen Barbers, Hairdressers & Cosmetologists' International Union of America, Local No. 105, 155 Ohio St. 573, 99 N.E.2d 782, the Supreme Court of Ohio passed upon the identical question now before this court. It was an equity action brought by the owner of a barber shop who works at the trade therein, against the same union, as in the instant case, to prevent the removal of a union shop card, under the same contract as involved in the instant case, because plaintiff would not accept a sterile membership in the union. The

court stated the law thus on page 785, of 99 N.E.2d:

"In the instant case, we do not deem it necessary to determine whether it is a proper and lawful labor objective to compel an employer, working in competition with his employees, to join the employees' union as an employer member with rights inferior to those of the employee members.

"Where, as here, there is no contractual obligation to continue to recommend or approve the services of another, we know of no common-law or statutory principle of public policy which requires one, who is accustomed to recommend and approve the services of others, to continue to recommend and approve the services of someone whose services he no longer wishes to recommend or approve, regardless of the lack of merit in the reasons he may have for discontinuing his recommendation and approval of those services. There may be limitations on the right of such one to criticize the services which he no longer wishes to recommend and approve but there is certainly no limitation on his right merely to discontinue his recommendation or approval of those services.

"Where one relies upon the recommendation and approval of another to build up his business without any agreement limiting the causes for which such recommendation and approval may be discontinued, such one necessarily runs the risk that such other may, without just cause, determine to discontinue such recommendation and approval."

The Supreme Court in this case held that as a matter of property rights and contract the union had the right to remove the card. It cites Rainwater v. Trimble, 1950, 207 Ga. 306, 61 S.E.2d 420, which passed upon the same questions as in the instant case and held that as a matter of contract the union had the right to remove its card.

The Supreme Court of Colorado in Journeymen Barbers, Hairdressers, Cosmetologists & Proprietors International Union of America, Local Union No. 205, v. Industrial Commission, 128 Colo. 121, 260 P.2d 941, passed upon the same question as involved in the instant case but the statutory laws of Colorado declared the policy of the state as to employment relations and collective bargaining, and, for that reason, is not in point in the present case.

The same is true in Wisconsin Employment Relations Board v. Journeymen Barbers, Hairdressers & Cosmetologists' International Union of America, Local 379B, 256 Wis. 77, 39 N.W.2d 725, 726. In this case the state statute made it an unfair labor practise for an employer in concert with others "to contribute 'financial support'" to any labor organization. Thus, the public policy of Wisconsin was determined by statute and is no authority in this case.

It will be seen that the authorities of the different states on the questions involved are not in harmony. Of course, in many of the states public policy has been established by statute. In Missouri, however, there has been no fixed public policy declared either in the Constitution, legislative enactment or by Judicial declaration. The cases cited from Missouri are not in point. The question as to the removal of a union shop card under a contract between the union and a barber who works at the trade wherein it is admitted that the barber has not complied with the written contract, under which the shop card was furnished, has never been before our courts for decision.

In 31 Am.Jur. p. 878, Sec. 113, the law is stated:

"The terms of the collective agreement, as included in an individual labor contract, ought not to be construed narrowly and technically, but broadly, so as to accomplish its evident aims and protect both the employer and the employee. It has been held that such contracts are to be construed precisely as contracts between individuals."

Under the written contract in the instant case plaintiffs have agreed to be governed

by the conditions contained on the back of the shop card and these conditions provide that plaintiffs will not only comply with the rules, regulations and constitution of the union, as it now exists, but such laws as may be made in the future for the government of the union. We think that a fair and liberal interpretation of the contract would require plaintiffs to conform to such laws made in the future which were legal and reasonable but would not bind the plaintiffs for all time in the future, to abide by illegal enactments of the union or laws so unreasonable as not to have been within the contemplation of plaintiffs and the union at the time the agreement was made.

An examination of the decision of the courts in other states reveals that it is a proper labor objective to compel employers, who work at the trade in competition with union members to join an employee organization. Riviello v. Journeymen Barbers, etc., supra; Cafeteria Employees Union, Local No. 302 v. Angelos, supra; Coons v. Journeymen Barbers, etc., supra.

The only possible exception would be the opinion in Safeway Stores, Inc., v. Retail Clerks International Ass'n, supra, which we think is distinguishable upon the facts. This case was decided by the Supreme Court of California October 16, 1953. However, in the case of Los Angeles Pie Bakers Ass'n v. Bakery Drivers Local No. 276, 122 Cal.App.2d 237, 264 P.2d 615, 617, decided December 22, 1953, the court stated this law:

"A union may take into membership 'businessmen-workers' who operate in an industry, field or trade in competition with organized workmen. Bautista v. Jones, 25 Cal.2d 746, 749, 155 P.2d 343; Cafeteria Employees Union [Local No. 302] v. Angelos, 320 U.S. 293, 64 S.Ct. 126, 88 L.Ed. 58; Riviello v. Journeymen Barbers, etc., Union, 88 Cal.App.2d 499, 504–506, 199 P.2d 400. From these cases it is clear that the conventional employer-employee relationship need not exist in order that the worker have union membership and representation."

Following these decisions we hold there is no merit to plaintiffs' first contention that the written contract was for an unlawful labor objective. And we hold that if the labor objective is valid, it is not made unenforceable because it might affect the collective bargaining rights of the parties or their right to contract.

Under plaintiffs' first allegation of error, sub-head (b), it is contended that the trial court erred in dismissing plaintiffs' petition for the reason that the union demands that plaintiffs join it is against public policy of Missouri and threats of coercion in furtherance of such demand are unlawful.

To sustain this contention plaintiffs cite Dille v. St. Luke's Hospital, 355 Mo. 436, 196 S.W.2d 615. This was a personal injury suit for damages suffered by plaintiff while a patient, resulting from negligence of the agents and servants of the hospital. The question was whether or not a charity such as the defendant, should be answerable for the negligence of its agent on the ground of public policy. On page 619 of 196 S.W.2d, the court stated the law:

"'The term "public policy", being of such vague and uncertain meaning, and of such variable quantity, has frequently been said not to be susceptible of exact or precise definition; and some courts have said that no exact or precise definition has ever been given or can be found. Nevertheless, with respect to the administration of the law, the courts have frequently quoted and often approved of the statement that public policy is that principle of the law which holds that "no one" can lawfully do that which has a tendency to be injurious to the public or against the public good; * * * "Public policy" has been said to be synonymous with "policy of the law," and also has been defined as "the public good."' 50 C.J. 857, 858. 'The term "public policy" is one of broad significance and cannot be comprehensively defined in specific terms. One of the best definitions perhaps is that of Justice Story, which applied the term

to that which "conflicts with the morals of the time, and contravenes any established interest of society." 1 Story on Const., 675. * * * An excellent definition is also found in Black's Law Dictionary, where it is said: "The term 'policy,' as applied to a * * * rule of law * * * refers to its probable effect, tendency, or object, considered with reference to the social or political well-being of the state. * * *" ' * * *' ".

Gideon-Anderson Lumber Co. v. Hayes, 348 Mo. 1085, 156 S.W.2d 898. This was an action involving landlord and tenant and the court held that contracts which contravene public policy cannot be made at all; that liberty to contract is one of the rights protected by due process clause of the constitution.

We have, heretofore, stated in our opinion that public policy is usually a legislative or constitutional function but it is held that where neither the constitution nor the legislature has acted, the judiciary may determine public policy. In the instant case the rights of the parties are contractual. It is the duty of this court to enforce such contract if it pertains to a lawful labor objective and we have held that it did. Therefore, we hold that it is not against public policy, either as declared by the constitution, legislature or by the courts, and we find there is no merit to this contention.

We have commented upon most of the cases cited by plaintiffs and those we have not commented upon are cases where public policy has been declared by the legislature as in the cases cited from Massachusetts, Wisconsin and Colorado. The only opinions from states not controlled by statute which have passed upon the same facts as in the instant case, are Ohio and Georgia and they have gone far beyond what we are holding in the instant case.

They hold that as a matter of contract, plaintiffs cannot recover.

We find there is no merit in plaintiffs' last contentions.

Judgment affirmed.

STONE, J., concurs in result.

RUARK, J., dissents.

RUARK, Judge.

I dissent.

First, considering the question from the standpoint of contract, I believe the rule (made by the union long after the execution of the contracts) which required the proprietor to join the union and thereby become subject to its discipline so that it had, in practical effect, the power to nullify any contract between the parties, was one which was not within the reasonable contemplation of the parties and therefore not "reasonable."

Exhibit A, the contract, covered the field in respect to employment, wages and working conditions relative to the affairs then involved. It is alleged that concurrently another contract was executed in respect to the shop card. This is not set forth haec verba, but I will assume it provided that the proprietor would comply with the rules printed on the reverse, and these rules therefore became part of such contract. Simultaneously the card was placed in the shop and was maintained during successive renewals of the contracts. All these things were concurrent and related to one thing, accomplished one end. Concurrent or near-concurrent agreements relating to the same subject matter are to be considered and construed together, and the meaning of one must be determined in the light of all the others.[1] If the meaning of the contract is not clear, then even the concurrent acts of

1. 4 Page on Contracts, sec. 2046, p. 3537 et seq.; 17 C.J.S., Contracts, § 298, page 714; Bank of Mountain View v. Winebrenner, Mo.App., 189 S.W.2d 429, 439, and cases cited; National Bank of Commerce of Kansas City, Mo., v. Flanagan Mills & Elevator Co., 268 Mo. 547, 188 S.W. 117, 120.

the parties in setting the transaction in motion and, as in this instance, the acts of the parties in respect to the various renewals and their practical construction of the arrangement may shed some light.[2]

Parenthetically, the words "the same" give rise to a question of interpretation. In the opinion of the Ohio court, Foutts v. Journeymen Barbers, etc., 155 Ohio St. 573, 99 N.E.2d 782, 785, the future laws to be made are taken as being applicable to the *shop cards*. In the opinion of my learned brother the words are interpreted as meaning such future laws as may be made in government of the *union*. If the courts do not agree upon what the language means, certainly there is ambiguity as affects the understanding of the layman. Applying the language of the street and not attempting the approach of a lexicographer, one would say that shop cards are regulated, whereas unions are governed. If it means that the proprietor will be governed by all the laws of the union, then the only fair construction of such requirement would be a declaration of good faith in complying with the requirements of Exhibit A, for to interpret such language literally would destroy the mutuality of the contract at its inception, since the union could by its laws nullify each and every portion of the agreement. However, I do not rest my dissent upon such narrow ground.

In construing a contract [as distinguished from interpreting its words, symbols or other means of expression, construction having the broader meaning in the sense in which I use it (see 3 Corbin on Contracts, sec. 534, p. 7)] we endeavor to ascertain the intention of the parties;[3] this for the reason normally a contract is a matter of mutual assent often said to be a meeting of the minds, and without such assent there can be no contract. This is elementary. Thacker v. Massman Const. Co., Mo.Sup., 247 S.W. 2d 623, 629. It is said, and I agree, that any competent person may contract to do any lawful thing even though it be to his great disadvantage; but the question remains and the question is here, what *did* these parties agree to do? Was the proprietor to abide by just any law the union might make in the future, or was it any rule *reasonably relating to the subject then involved?*

In order to determine the intention we first look to what the parties expressed, and this usually suffices. But this is not always so by any means, for parties often think only of the present and in general terms, leaving the future of their transaction clouded by doubt. It is frequently said that greater regard should be had to the intention of the parties than to any particular words which they have used in attempting to express it.[4] "A court may thus be able to realize the aims and purposes of the parties even though their express words would otherwise be interpreted differently and would produce a different legal effect." 3 Corbin on Contracts, sec. 545, pp. 90, 91. In Bird v. St. Paul Fire & Marine Ins. Co., 224 N.Y. 47, 120 N.E. 86, 87, 13 A.L.R. 875, Justice Cardozo, in construing an insurance policy, used the following language:

"General definitions of a proximate cause give little aid. *Our guide is the reasonable expectation and purpose of the ordinary business man when making an ordinary business contract. It is his intention, expressed or fairly to be inferred, that counts.* (My emphasis.) There are times when the law permits us to go far back in tracing events to causes. The inquiry for us is how far the parties to this contract *intended* us to go. The causes within their contem-

2. 4 Page on Contracts, sec. 2034, p. 3510 et seq., Velvet Freeze, Inc., v. Milk Wagon Drivers', etc., Mo.App., 177 S.W.2d 644, 646, and authorities cited; Matthews v. McVay, Mo.App., 234 S.W.2d 983, 987.

3. Harvey v. Missouri Valley Electric Co., Mo.Sup., 268 S.W.2d 820, 822; Missouri Athletic Ass'n v. Delk Inv. Corporation, 323 Mo. 765, 20 S.W.2d 51.

4. 17 C.J.S., Contracts, § 295, page 693; Truck Leasing Corp. v. Esquire Laundry & Dry Cleaning Co., Mo.App., 252 S.W. 2d 108, 111; Stephenson v. Morrissey, Mo.App., 230 S.W.2d 124, 127; Ambassador Bldg. Corp. v. St. Louis Ambassador Theatre, 238 Mo.App. 600, 185 S.W. 2d 827, 836.

plation are the only causes that concern us. A recent case in the House of Lords gives the true method of approach. Leyland Shipping Co. v. Norwich F. Ins. Co., 1918 [A.C. 350, 369]. Lord Shaw refers in his opinion to the common figure of speech which represents a succession of causes as a chain. He reminds us that the figure, though convenient, is inadequate. 'Causation is not a chain, but a net. At each point, influences, forces, events, precedent and simultaneous, meet, and the radiation from each point extends indefinitely.' [Ibid.] From this complex web the law picks out now this cause and now that one. The same cause producing the same effect may be proximate or remote as the contract of the parties seems to place it in light or shadow. That cause is to be held predominant which they would think of as predominant. A common-sense appraisement of everyday forms of speech and modes of thought must tell us when to stop. It is an act of 'judgment as upon a matter of fact.' [Ibid.] * * * "

In attempting to determine the intent of the parties we often look at the surrounding circumstances, the situation of the parties and their relationship to each other at the time they entered into contract.[5] A common expression of the law writers is that the court will attempt to place itself in the position of the parties and look at the transaction through their eyes. 2 Elliott on Contracts, sec. 1517, pp. 791, 792. One of the most important things the court considers is their reason for making the agreement, the object of their contract and *the apparent purpose which they mutually seek to accomplish*.[6] Since it is impossible to actually assume the personality of the person or persons through whose glasses they desire to peer, the courts have of necessity been forced to invent that mythical person, the reasonable man, and ask, what would a reasonable man (and thereupon egotistically assert the qualities of reasonableness in themselves) have contemplated or expected? Thus the word "reasonable" has become the universal wrench by which the courts have unscrewed the tough nuts of construction and it has been read into myriads of contracts. "Reasonable time" and "reasonable price" are but two of many instances. See 36 Words and Phrases, p. 348 et seq.

One of the frequently recurring situations in which one of the parties has, by apparent language, placed himself at the mercy of the opposite party is that of fraternal insurance where the member agrees to be governed by all by-laws and rules thereafter enacted. An examination of the numerous cases cited and quoted by the Supreme Court in banc in the case of Dessauer v. Supreme Tent, Knights of Maccabees of the World, 278 Mo. 57, 210 S.W. 896 (which has been cited and followed many times), makes clear the law that a reservation by an association of the right to make future laws obligatory upon the member cannot justly be deemed to comprehend the right to make such laws as will impair the contract itself. In Morton v. Supreme Council of Royal League, 100 Mo.App. 76, 73 S.W. 259, 264, the court said, "Common sense tells us * * * he did not intend to empower the association to abrogate part of its liability. The principle of construction to be applied to the enactments of an order intended to operate retrospectively is that they shall have an effect on future contracts such as may, with probability, be assumed to have been contemplated by the contracting parties instead of one in the nature of confiscation."

5. Restatement of the Law, Contracts, 235 (d), p. 319; P. R. T. Investment Corp. v. Ranft, 363 Mo. 522, 252 S.W.2d 315, 318; Gabel-Lockhart Co. v. Gabel, 360 Mo. 518, 229 S.W.2d 539, 543; Burman v. Vezeau, 231 Mo.App. 1109, 85 S.W.2d 217, 220; Collins v. Truman, 223 Mo.App. 186, 14 S.W.2d 526, 528.

6. Larson v. Crescent Planing Mill Co., Mo.App., 218 S.W.2d 814, 819; Veatch v. Black, 363 Mo. 190, 250 S.W.2d 501, 507; Kansas City Structural Steel Co. v. Utilities Bldg. Corp., 339 Mo. 68, 95 S.W.2d 1176, 106 A.L.R. 244; Tracy v. Aldrich, Mo.Sup., 236 S.W. 347, 351; 17 C.J.S., Contracts, § 321, pages 744, 747.

Since we are to place ourselves in the position of the parties at the time and consider the object of the contract and the apparent result sought to be accomplished, let us examine first what they sought to attain and secondly the result which follows if the respondents' interpretation of the contract is accepted. We can safely say that they intended to effect an arrangement in regard to working conditions and rate of pay. The proprietors, on the one hand, settled their employment question and were assured (or so they thought) of harmonious labor and employee relations for the life of the contract. On the other hand, the union secured recognition as bargaining agent and a satisfactory arrangement in regard to hours and pay. The proprietor and union were dealing as adversaries. Friendly though they may have been, they were bargaining and figuratively they sat on opposite sides of the table. Since the proprietor was dealing with the union as an adversary, it would strain common sense to say that he reasonably contemplated that in the same bargain he was surrendering the very thing which permitted him to bargain freely and by it would or conceivably could be required to promote the interests of his adversary against his own; to fail to support legislation which might be to his advantage; to withdraw from his own trade organization, which was presumably to his benefit in a way analogous to the way in which membership in the union is a benefit to its members; to surrender the right to bring an action to enforce whatever rights he might have as an employer; in total effect to place himself within the power of his adversary to such an extent that in practical application he could no longer bargain with the union as a free agent. I think it cannot be said from this arrangement that either of them, as a reasonable party, was then contemplating the probability or even the possibility that the proprietors would be required to join the union as a condition to keeping the contract in force. As a matter of fact, it does not appear that under the union rules as they then existed the proprietor *could* have been a full-fledged

member. If there was such an intent (that of forcing the proprietor to join the union) at the time it was not one which the transaction reasonably encompassed and it was not apparent. Any secret uncommunicated intention which respondents may have had and which was not so apparent would not become a part of the contract. McClintock v. Skelly Oil Co., 232 Mo.App. 1204, 114 S.W.2d 181, 189. An examination of the *results* attained if the contract be construed to mean that the union can require the proprietor to join the union leads us to the existing laws of the union. Art. II, sec. 4, provides that any member who brings any action against the union or directly or indirectly aids, abets, counsels or advises such shall be suspended. Art. XVII, sec. 7, provides that any member who shall directly or indirectly conspire "or operate against the interests of" the union shall have his membership annulled. Art. XVII, sec. 8, provides that no active member shall join or continue in the membership of any organization composed wholly or partly of employers, or any organization that is construed to be in conflict with the policies of the union. Art. XVIII, sec. 1, provides that if any member be guilty of preventing passage or enforcement of legislation endorsed by the union or shall in any way, directly or indirectly, aid in any cause, movement or thing that may prevent or delay passage or enforcement of legislation desired by the union he shall be disciplined by fine. Art. VII, sec. 3, provides that when the shop card is removed all member employees shall immediately leave the employment. These laws were adopted by the union after the execution of the contracts.

If the proprietor belongs to the union he will be bound by the laws of the union. It is not inconceivable that at some time during the life of the present contract he as a union member may be required to join in a disagreement with himself as proprietor in some dispute. It is within the realm of possibility that he may, in self-protection, be required *as a proprietor* to bring suit against the union to enforce some pro-

vision of the present contract, which will automatically bring about his suspension as a union member with attendant results. It is even conceivable that a strike might be called against a shop and he, the proprietor, be thus found, as a union member, trudging back and forth before his own business carrying a placard which proclaims himself as "unfair." I mention this last as an absurdity only to demonstrate the fallacy of a construction which holds that the parties intended or could reasonably contemplate that a contract which had for its purpose the adjustment of normal things concerned with the arrangement in respect to a union shop could be twisted into a construction that the parties intended to place in the hands of the union the power to change the rules in the middle of the game so that the game itself could be awarded by default. It will be presumed that the parties contracted with reference to a fair, reasonable and practical result. Tureman v. Altman, 361 Mo. 1220, 239 S.W.2d 304, 309, 26 A.L.R.2d 729; Paisley v. Lucas, 346 Mo. 827, 143 S.W.2d 262, 268. And it is the rule that if the proposition is doubtful or susceptible of more than one meaning the court will reject that construction which imposes undue hardship on one party or gives undue advantage or power to the other. Miller v. Bowen Coal & Mining Co., Mo.App., 40 S.W.2d 485, 490; Mecartney v. Guardian Trust Co., 274 Mo. 224, 202 S.W. 1131, 1134, and cases cited.

Many illustrations could be given, but the length of this opinion limits me to one. A pugilist employs a manager and agrees to abide by every future rule, direction and requirement of such manager. The manager thereafter contracts for a boxing match wherein the opponent will be armed with a Roman cestus, or, if modern methods are preferred, with iron knucks. I think that undoubtedly it would be said that the agreement to abide by the rules and requirements of the manager was intended to apply to the thing in the contemplation of the parties at the time the agreement was made, to-wit, contesting with boxing gloves, and that a contest against an opponent armed with lethal weapons was not within such contemplation and therefore not a part of the assent. The right of the union to control the activities of the proprietor as a union member and to limit him in doing that which he would normally do as the owner of his own business is, I would say, a lethal weapon.

My conclusion is that the requirement that the proprietor join the union and become subject to its laws was not such a "future law" as was or could have been within the reasonable contemplation of the parties at the time they made the contract. If it was not, then the requirement which the union seeks to impose as a condition for retention of the card is not proper or reasonable within the purview of the contract as made and, such being the case, the proprietor did not violate the contract which, when considered as a whole, required the maintenance of the shop card during the life of the contract.

Second, I think that the requirement that the employer join the union is not a proper labor objective and is against public policy. It is to the public interest that the right of collective bargaining be preserved. This is a fundamental or natural right which the federal statutes and state statutes and constitutional provisions have merely affirmed. They did not create it [see cases under Master and Servant, 56 C.J.S., § 28 (20), pages 156, 157]. The essence of collective bargaining is the employee's freedom of choice and the test is whether there is a collective bargaining free from all taints of an employer's domination or influence. Supra, § 28(25), page 165. Collective bargaining is a sham where the employer can sit on both sides of the table. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 268, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, 312. The great progress made by labor in the first half of the century was due in large measure to the fact that the officers of the union spoke from the authority of a united front—a group of people having a common interest and a common goal;

therein was the true muscle of the power to make advantageous bargains. The view expressed by the respondents, whereby the employers are to become a part of the union (although an unwilling part), could serve only to dilute this power and weaken that muscle. Friendly though the employers and the employees may be, and though they may have a common interest in fixing the prices of barber-shop service, nevertheless when they bargain with each other they are adversary parties and their interests are opposed. Self-interest would compel the employer to seek that which he could to his own advantage even though it be against the interests of the union. It can of course be argued that the working membership outnumbers and can, at least at the present, outvote the employers; but the power to influence is not always measured in numbers. Any theory which permits participation in union deliberations and decisions by one whose interests on the subject may be opposed to that of the union is a wedge which should not be allowed to make the first breach. I know of no better way to express it than in the language of the California Supreme Court in bank in Safeway Stores, Inc., v. Retail Clerks International Ass'n, 41 Cal.2d 567, 261 P.2d 721, wherein it was said at loc. cit. 726, "It is eminently proper that management supervisors, the store managers in this case, be kept free from the divided loyalty that would be engendered by compulsory membership in the defendant local unions. Under the law an employer may not demand that his representatives sit in the inner councils of labor and thus be placed in the position of exerting his influence in directing labor's policies and activities. If such an objective were recognized and were accomplished collective bargaining would be in confusion and indeed futile. By the same token an employee union may not insist that a representative of the employer be required to participate in its deliberations under union rules and thus divide his loyalty."

Missouri has no statute which covers this situation. However, it will be noted in Chapter 295, RSMo 1949, V.A.M.S., dealing with labor disputes in public utilities, the legislature evidently recognized the necessity of having equal representation of the two groups and therefore provided for a mediation board which should be composed of two employers of labor and two employees holding union membership. It is at least indicative of the fact that the General Assembly recognized labor and employer as two separate entities with oftentimes opposing interests.

Public policy in matters of this character is for the individual state. It was so held in International Brotherhood of Teamsters, etc., v. Hanke, 339 U.S. 470, 70 S.Ct. 773, 94 L.Ed. 995. In that case the Supreme Court of the State of Washington had enjoined a union from picketing garage men who were self-employers. It was said by Mr. Justice Frankfurter of the Supreme Court of the United States at loc. cit. 475 of 339 U.S. loc. cit. 776 of 70 S.Ct., loc. cit. 1002, of 94 L.Ed., "Unions obviously are concerned not to have union standards undermined by non-union shops. This interest penetrates into self-employer shops. On the other hand some of our profoundest thinkers from Jefferson to Brandeis have stressed the importance to a democratic society of encouraging self-employer economic units as a counter-movement to what are deemed to be the dangers inherent in excessive concentration of economic power. 'There is a widespread belief * * * that the true prosperity of our past came not from big business, but through the courage, the energy, and the resourcefulness of small men * * * and that only through participation by the many in the responsibilities and determinations of business can Americans secure the moral and intellectual development which is essential to the maintenance of liberty.' Mr. Justice Brandeis, dissenting in Louis K. Liggett Co. v. Lee, 288 U.S. 517, 541, 580, 53 S.Ct. 481, 502, 77 L.Ed. 929, 940, 961, 85 A.L.R. 699." The State of Missouri is blessed by a great many people who may be referred to as "little business." This great group is composed

of those who have saved (or borrowed) a little capital with a desire to produce some product or some service beyond that which can be done with their own hands. This group, "the little business men," comprises a large and vital segment of our society and economic life. There are few of them who do not, along with their capital, their forethought and their worries, contribute some of their own energy and personal labor to the success of their business. This applies to the garage proprietor who may sell a tire or recharge a battery; the druggist who may mix a soft drink or sell a bottle of medicine; the groceryman who may sack up potatoes, and so on ad infinitum. In all of these he competes with his own help. In a great many instances he could not survive if he did not do so. The men and women of this group are neither big business nor labor. They are the balance wheel in our economic way of life. It is essential that they remain as they are, a sum total of individual and independent thought and action. One question of public policy is whether or not these little business men may be coerced, either directly or indirectly, into joining a union against their own volition. I think we find sufficient expressions heretofore made by our courts to answer in the negative.

In Hughes v. Kansas City Motion Picture Machine Operators, 282 Mo. 304, 221 S.W. 95, a union was attempting to make an owner employ a union operator instead of handling the picture machine himself (in the present case the object is to require him to employ himself *as a union member*). The court called attention to the fact that the dispute was not the outcome of any grievance of organized labor that contained merit, such as involving resistance to oppression or an equitable division of the profits yielded by labor and capital in combination (and there is none in this case). It was said, 221 S.W. loc. cit. 97, by Judge Goode, "The right asserted by plaintiffs to keep down the expense of their business by having Hughes manipulate the projector is the simple and primitive right of a man to earn a livelihood

with his own hands, as much so as that of a blacksmith to blow his forge." And it was said by Judge Graves in a separate opinion, 221 S.W. at loc. cit. 101, "The real question in this case is whether or not a man, under the law, can run his own business, or shall it be run for him by a local union?" The court then further, 221 S.W. at loc. cit. 102, used the illustration of the farmer who with his family did his own work, and stated that farm hands had as good a right to organize and bargain collectively as the theater machine operators.

It will be noted from the declaration of both judges in that case that not only the picketing but the propaganda was in effect a misrepresentation regarding the plaintiff's attitude toward organized labor, and the effect of the conduct of the union was to subject the proprietor to a boycott.

In Purcell v. Journeymen Barbers, etc., 234 Mo.App. 843, 133 S.W.2d 662, it was said, loc. cit. 670, "Subject to the right of labor to insist upon proper working conditions and upon what it deems to be reasonable hours and a fair return for the work of its hands, plaintiff has the right to conduct her business, free from interference, in any lawful manner she sees fit and to charge such prices as she may determine. This has frequently been held to be a property right which the courts will protect under proper circumstances by injunctive relief." 133 S.W.2d at loc. cit. 671 the court quotes with approval from Lyle v. Local No. 452, Amalgamated Meat Cutters, etc., 174 Tenn. 222, 124 S.W.2d 701, where a union attempted to force a butcher who did his own work to join the union, and where it was held that *the end sought* was unlawful. The same case was again quoted to the effect that " 'the right to conduct a lawful business is a property right, protected by the common law and guaranteed by the organic law of the state.' " In that case the court emphasized the fact that there was no industrial dispute. The employer and union had come to terms and there was a binding contract between them. It was said,

" 'Here the employer was not "unfair to organized labor." He had the right to be let alone.' "

In Bellerive Country Club v. McVey, No. 44,092, Missouri Supreme Court, June 13, 1955, —— S.W.2d ——, the court said, "We think it is clear that the right guaranteed to employees by Art. I, Sec. 29, Mo. Const.1945, 'to organize and to bargain collectively through representatives of their own choosing' is a free choice, uncoerced by management, union, or any other group or organization, so that picketing with an objective in violation of that guaranty must be regarded as equally unlawful as where coercion to violate a statute is involved." In that case, where no bona fide labor dispute was in progress, the court further said, "Thus where, as here, the evidence considered as a whole discloses no reasonable 'objective' other than to accomplish the 'effect' which the picketing had, it would be entirely unrealistic to hold that the object of the 'organizational' or 'advertising' picketing instantly involved was other than to affect so adversely the club's operation as to cause the employer to intervene and coerce its employees into union membership. We think the conclusion that such was the real objective of the instant picketing is inescapable under the facts."

The case of Lohse Patent Door Co. v. Fuelle, 215 Mo. 421, 114 S.W. 997, loc. cit. 1004, 22 L.R.A.,N.S., 607, involved primarily the question of boycott by a union, but it was said, "The wrongful interference with one's business and prospective customers is as much an infringement of his rights as though contractual relations actually existed and were interfered with." And again, "A person's occupation or calling, by means of which he earns a livelihood and endeavors to better his condition, and to provide for and support himself and those dependent upon him, is property within the meaning of the law, and entitled to protection as such." And again, "Complainants were engaged in a lawful business, and carrying it on in a lawful manner. They had done nothing to the defendants, or any of them, either illegal,

immoral, or unjust. They were paying wages to their teamsters in fact greater than the union teamsters received * * *." The court stated that the course pursued by the defendants, if unchecked, would soon ruin complainants' business and bring upon them financial ruin. And, 114 S.W. at loc. cit. 1005 it further said, " 'The law abhors subterfuges. It lays aside the covering and looks to the actual facts beneath. In the language of Chief Justice Shaw: "The law is not to be hoodwinked by colorable pretenses; it looks at truth and reality through whatever disguise it may assume." Com. v. Hunt, 4 Metc., Mass., 111, 129, 38 Am.Dec. 346. Threats in language are not the only threats recognized by the law. Covert and unspoken threats may be just as effective as spoken threats.' " In the instant case, brushing aside subterfuge and looking to the real facts, the threat to remove the card is coercion. Under the union laws, when the card is removed the employees must walk out, and the result, or at least the impliedly threatened result, will be in effect what amounts to a boycott. Indeed, this is recognized by the writer of the majority opinion in Foutts v. Journeymen Barbers, etc., 155 Ohio St. 573, 99 N.E.2d 782, 787, wherein the court made the charitable (?) remark that if plaintiff does not have the continued recommendation and approval of the defendant union indicated by the display of the defendant's union shop card, the decrease in plaintiff's business will be such as to eliminate any necessity for hiring the assistant that he now employs. The union card of itself has little intrinsic value. As was stated in Di Leo v. Daneault, 329 Mass. 590, 109 N.E.2d 824, 827, "The union desires possession of the cards, not because it wishes to make some use of them or to sell them, but because of what they symbolize and because of the effect it anticipates from the withdrawal of them. * * * The union desires the cards because it wishes to compel the defendant to join the union and to contribute to its support." It was stated that if the object sought is contrary to public policy a court of equity would not lend its aid in accomplishing that object,

532

whatever agreement the defendant may have made.

In the instant case the respondents argue that the proprietors have enjoyed the benefits as are exemplified by plaintiffs' Exhibit A "completely free of charge" and "apparently respondents' union, in formulating the new constitutional requirements, decided that employer-barbers should also pay." I think this also is not a lawful labor objective and that this of itself is contrary to the public policy of Missouri.

In my opinion the defendants' motion should have been overruled and the plaintiffs' motion should have been sustained.