Curly ROY, Carl Wallace, and George Purcell,
Plaintiffs-Respondents,

v.

Jimmy TINSLEY, Defendant-Appellant.

No. 8026.

Springfield Court of Appeals.

Missouri.

March 30, 1962.

Walker, Daniel, Clampett, Rittershouse & Ellis, B. H. Clampett, Springfield, for appellant.

Chinn, White and Dickey, Turner White, III, Springfield, for respondents.

McDOWELL, Judge.

This is an action in attachment to recover the purchase price of 18 head of cattle purchased by defendant from plaintiffs September 16th and 17th, 1960.

Defendant-appellant, W. C. Tinsley, admits the purchase of the cattle for the sums alleged in the petition but pleads he paid for them to one, Mack Morris, agent of plaintiffs for receiving payment.

The cause was tried by the court and judgment rendered for plaintiffs for $3575.-00 purchase price plus $153.19 interest.

The evidence offered on the issue presented is not in dispute. W. C. Tinsley, Jr., a dairy cattle broker, d/b/a "Tinsley Farms" is, and was at the times mentioned in the petition, a resident of Lafayette, Alabama. Plaintiffs, George Purcell, Carl Wallace, and Curly Roy, are cattle dealers residing respectively in Elkland, Willard, and Springfield, Missouri.

On September 16, 1960, plaintiff, Wallace, sold defendant 4 head of cattle for an agreed price of $750.00; Purcell sold him 3 head of cattle for $540.00, and Roy sold him 12 head for $2285.00.

Under the terms of purchase plaintiffs were to deliver the cattle to Mack Morris' pens on East Division Street Road in Springfield, where they would be treated for Bangs and TB disease and, thereafter, loaded into a large trailer for shipment to Alabama.

The evidence is that defendant and his agent, R. K. Rice, began buying cattle from local dealers in Missouri in October, 1959. Defendant testified that he was a total stranger in the community so he contacted a local dealer, Mack Morris, and paid him $10.00 a head commission to assist in buying the cattle. As to Morris' duties he testified:

"Q. What did he do to earn that commission? A. Made appointments for us to look at cattle from different dealers, carried us around to see the cattle, helped us buy the cattle from the different dealers, had the cattle sent in to his place, fed them, took care of them, until time for them to be loaded, which might be one day or it might be five days, might be a week.

"Q. And distributed the money, didn't he? A. He paid the other—he paid the people that we purchased the cattle from, that he made the appointments with for us to go look at the cattle."

It was defendant's testimony that during the time he was buying cattle in Missouri he would call Mack Morris when he needed cattle, or, at times, Morris would call them (meaning either defendant or Mr. Rice, his agent), and tell them the different dealers who had cattle on hand or that they had been calling him wanting defendant or his agent to come up and buy cattle.

He testified that at the time he purchased cattle it was understood between him and the seller that Morris would pay by his personal check; that defendant or his agent, before leaving the State, would figure the total purchase price of all cattle bought from plaintiffs and others and give Mack Morris a check on the "Tinsley Farms" for that amount plus $10.00 a head commission. He further testified that neither of the plaintiffs ever made any objection to the method of payment. One of the plaintiffs did complain to Rice that they were a long time receiving their checks and Rice told him if he would complain to Morris he would do something about it but this was never done.

In the transactions of September 16th and 17th, 1960, defendant purchased 59 head of cattle from nine dealers. These purchases included the cows bought from plaintiffs involved in the instant lawsuit. Before leaving defendant gave Morris a check for $12,095.00, which, of course, included not only the purchase price of the 59 cattle but Morris' commission. The testimony is undisputed that all the cattle purchased by defendant or his agent for the Tinsley Farms during the entire period defendant was doing business in Missouri were sold directly to defendant. He testified that at no time did Mack Morris ever have any interest or title to the cattle purchased. He introduced what he called "Bills of Sale" for cattle purchased but these instruments were not bills of sale but merely written statements, written by Morris' employee, showing the number of cattle bought from each of the sellers, the purchase price, etc., and were not signed by anyone. Each of the plaintiffs in the instant case admitted they were looking to Morris for payment.

Under questioning by the court defendant testified that he never had any agreement that he would pay plaintiffs for the cattle. He gave this evidence:

"Q. Was there an agreement that Mack Morris would deliver the money to them? A. Yes, sir. Yes, sir, I guess so—it had to be or they wouldn't have sold the cattle through Mack Morris. The first time that I came up here, Mack Morris introduced me to these men, different men, I might have met twenty-five or thirty different ones. And they didn't know me from Adam. * * * If Mack Morris had not been along, those fellows wouldn't have sold me a cow unless I had the cash money. They wouldn't have taken my checks."

In answer to the court's further questioning, defendant testified: "A. Mack Morris introduced me to these fellows, and we had agreed to pay for the cows, and that was the way it was handled from October 6th of '59 through September the 17th of '60 when he didn't pay those boys for the cattle."

There was further evidence in the record that on three different occasions defendant had advanced to Morris cash in sums of $8,000 or $10,000 to pay for cattle purchased when Morris had informed defendant that the sellers wanted their money sooner than it would be paid them under the usual course. But, under the testimony, Morris, at no time, made the purchase of the cattle for defendant. He merely assisted as set out above. He never owned any interest in the cattle, therefore, was in no position to give a bill of sale. The evidence is that during the eleven months preceding the transactions in September, 1960, out of which the present suit arose, plaintiffs Wallace, Purcell and Roy sold cattle to the defendant respectively on six, ten and sixteen separate occasions and were paid by personal checks from Morris.

Defendant assigns as error the action of the trial court in overruling his after-trial motion for judgment because Morris was plaintiffs' agent for receiving payment. It is defendant's view of the case that under the undisputed evidence of course of dealing, Morris was plaintiffs' agent for receiving payment from the defendant.

To sustain defendant's position he cites Brooks v. Jameson, 55 Mo. 505; Large v. Frick Co., 215 Mo.App. 232, 256 S.W. 90 [2]; Bennett v. Potashnick, 214 Mo.App. 507, 257 S.W. 836; Wyse v. Miller, 222 Mo.App. 165, 2 S.W.2d 806; Klaber v. Fidelity Bldg. Co., Mo.App., 19 S.W.2d 758 [7]; Kraemer et al. v. Leber et al., Mo. App., 267 S.W.2d 333; Hamilton v. Hecht, Mo.App., 283 S.W.2d 894; and Mechem on Agency, 2d Ed. Vol. 1, § 717.

The law as declared in the cases cited is that agency may be implied and shown by the conduct and acquiescence of the principal, or from the course of business between them, and their actions in their course of business dealings; that if one induced another to believe in the existence of the particular state of facts, and the other acts thereon to his prejudice the former is estopped as against the latter to deny that the state of facts does in truth exist.

In Hamilton v. Hecht, supra, on page 899 [4] this law is stated:

"Appellants refer to the undoubted rule that when the maker pays money on a note to one who does not have the note in his possession he pays at his peril and at the risk of being required to show that the payee was authorized to collect the payment as the agent of the owner. When an implied agency arising out of a course of conduct is established, however, the case is taken out of the operation of the rule."

In Klaber v. Fidelity Bldg. Co., supra, 19 S.W.2d page 763[6,7] the court stated the rule relied on by defendant in this case, to-wit: "That agency may be shown by course of conduct as well as by express contract is well established".

In Leidy v. Taliaferro, Mo.Sup., 260 S.W.2d 504, 505[2, 3] the court quotes from Restatement, Agency: " 'Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' Restatement, Agency, § 1. The parties may not have intended to create the legal relationship or to have subjected themselves to the liabilities which the law imposes as a result of it, nevertheless, the relationship exists 'if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act.' Restatement, Agency § 15. * * * In this connection it may be noted that 'a person may be the servant of two masters' (Restatement, Agency, § 226), or he may become the lent servant of another (Restatement, Agency § 227), or he may act with a mixed or double purpose for himself and another. Foster v. Campbell, 355 Mo. 349, 196 S.W.2d 147; Restatement, Agency, § 236."

On page 506[4–6] of the opinion the court stated:

" * * * The requisite manifestation of consent to create the relationship may be 'written or spoken words *or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.*' Restatement, Agency, § 26. * * * While compensation to the agent is not essential to the creation or existence of the relationship (Restatement, Agency, §§ 16, 225) the fact that Leidy, Senior, was paid by Mr. Taliaferro personally, as the jury could have found, is a circumstance indicative of the relationship."

In Martin v. Mercantile Trust Co., Mo. Sup., 293 S.W.2d 319, 325[1–4], the court stated:

" * * * And, furthermore, there is no presumption of agency and the burden of establishing it is always on the party by

whom it is alleged to exist. * * * Agency involves not only a mutual consent, but in the usual case, an element of control, State ex rel. Mountain Grove Creamery, Ice & Electric Co. v. Cox, Banc, 315 Mo. 619, 286 S.W. 368; Leidy v. Taliaferro, Mo., 260 S.W.2d 504, * * *."

In Pashalian v. Big-4 Chevrolet Company, Mo.App., 348 S.W.2d 628, 632[2–4] the court stated:

"The evidence does not sustain the claim that Lesch was the agent of Pashalian. There is never a presumption of agency, and the burden of establishing agency is on the party asserting it and by whom it is alleged to exist. Martin v. Mercantile Trust Company, Mo., 293 S.W.2d 319. ' "Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." * * *' If an agency is to be implied from the facts, it must be implied from a natural and reasonable, and not a strained or distorted construction of the facts."

We have not attempted to analyze the facts of all the authorities cited by both plaintiffs-respondents and defendant-appellant. We have examined these authorities and the facts are so different as to shed little light upon the question here presented.

■ The law is well settled that each case must be decided upon the facts of that particular case. Spears v. Schantz, 241 Mo. App. 879, 246 S.W.2d 399, 406[4]; Kerkemeyer et al. v. Midkiff, et al, Mo.App., 281 S.W.2d 516[1].

■■ The law governing the issue here involved is well settled. We have set out the law as declared in the many authorities cited. The defendant asserts as his sole defense that Mack Morris was the agent of plaintiffs to receive payment for the cattle purchased. Under the law there is no presumption of agency and the burden of establishing it is on the party by whom it is

alleged to exist. Leidy v. Taliaferro, Mo. Sup., 260 S.W.2d 504, 505[2, 3]; Hamilton v. Hecht, Mo.App., 283 S.W.2d 894, 898[2]. We agree with defendant that agency can be established by course of dealing as well as by express words. This law was stated in Ferneau v. Whitford, 39 Mo.App. 311, 317, as follows:

" * * * Yet, if the principal, by his conduct and course of dealing, held out one to be his agent to receive mony and thus induces his debtor to pay money to such agent, he is concluded thereby. To permit the principal, in such case, to deny the authority of the agent, would be to perpetrate a fraud upon the debtor."

The law was clearly stated in 2 Am.Jur., § 2, page 13, (Agency) as follows:

"An agency may be defined as a contract either express or implied upon a consideration, or a gratuitous undertaking, by which one of the parties confides to the other the management of some business to be transacted in his name or on his account, and by which that other assumes to do the business and render an account of it. This is comparable with the definition of agency as adopted by the American Law Institute. That definition is as follows: 'Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' "

This rule of law was followed by our Supreme Court in Leidy v. Taliaferro, supra. In this case the court stated:

" * * * nevertheless, the relationship exists 'if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act'. * * *

" * * * The requisite manifestation of consent to create the relationship may be 'written or spoken words *or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the prin-*

*cipal's account.'* \* \* \* While compensation to the agent is not essential to the creation or existence of the relationship \* \* \* the fact that Leidy, Senior, was paid by Mr. Taliaferro personally, \* \* \* is a circumstance indicative of the relationship."

In the instant case the facts show that defendant and his agent, Rice, were residents of Alabama; that they desired to purchase dairy cattle in Missouri, and, being strangers, they either had to pay cash for the cattle purchased from different sellers or adopt some method of payment which would be acceptable to them. Defendant selected Mack Morris, a local cattle dealer, to assist him in the purchasing of cattle. He adopted a course of dealing whereby Morris would make appointments with owners of cattle, call defendant by phone, or defendant would call him, and defendant would come to Missouri, either himself or his agent, and Morris would take them to see the cattle. Defendant would make the purchases under an agreement that the sellers would deliver their cattle to Morris' pens for the purpose of having them tested for Bangs and TB disease and where they could be loaded on a large truck for transportation to Alabama.

 The court interrogated defendant as to his agreement with different cattle owners as to how the payment was to be made. Defendant testified that he had an agreement with them that Mack Morris would pay them by his personal check. He stated to a question by the court, "It had to be or they wouldn't have sold the cattle through Mack Morris". There isn't any testimony that these plaintiffs selected Mack Morris to act for them in receiving payment for their cattle. Mack Morris never owned or had any interest in the cattle bought. He was merely acting for the defendant for a commission. Thus, the defendant used Mack Morris as a means of payment. He selected the agent, it was his money that was used by Morris in the payment for the cattle and Morris was along because of his acquaintance with the various cattle sellers for the benefit of defendant. We find that

the defendant failed to offer evidence which establishes the defense he relies upon. The evidence reasonably interpreted in no way would cause plaintiff to believe Morris was acting for them. We think the only reasonable interpretation to be reached is that defendant was using Mack Morris as a suitable means by which payment could be made to the plaintiffs. The course of dealing as shown by the evidence is not in controversy. Defendant selected Morris to act for and in his behalf to pay for the cattle he purchased. Morris was subject to the control of defendant. He defaulted in his obligation under his agreement with the defendant. Thus where one of two innocent persons must sustain a loss by the fraud of a third person, the loss must of necessity fall upon the one who put the power in the third person to commit the fraud.

Judgment affirmed.

RUARK, P. J., and STONE, J., concur.